EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asoc. Pro Bienestar Vecinos Urbanización Juan B. Huyke Inc., et al.<br><br>      Peticionarios<br><br>            v.<br><br>Banco Santander de Puerto Rico<br><br>      Recurridos | Certiorari<br><br>2002 TSPR 97<br><br>157 DPR _____ |

Número del Caso: CC-2001-147

Fecha: 28/junio/2002

Tribunal de Circuito de Apelaciones:
                    Circuito Regional I

Juez Ponente:
                    Hon. Rafael Ortiz Carrión

Abogado de la Parte Peticionaria:
                    Lcdo. Angel M. Landrón Sandín

Abogado de la Parte Recurrida:
                    Lcdo. Félix R. Figueroa Cabán

Materia: Injunction Permanente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asoc. Pro Bienestar Vecinos
Urbanización Juan B. Huyke
Inc., et al.

    Peticionarios

        vs.                         CC-2001-147     CERTIORARI

Banco Santander de Puerto Rico

    Recurridos

**Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LOPEZ**

        San Juan, Puerto Rico, a 28 de junio de 2002

La parte demandante, Asociación Pro Bienestar Vecinos de la Urbanización Huyke, recurre ante nos de una sentencia emitida por el Tribunal de Circuito de Apelaciones, confirmatoria de otra emitida por el Tribunal de Primera Instancia, denegatoria la misma de una petición de interdicto permanente radicada por dicha Asociación con el fin de que el demandado, Banco Santander de Puerto Rico, cesara de utilizar dos solares, ubicados dentro la mencionada Urbanización, como estacionamiento para una de sus sucursales bancarias; solicitud de interdicto predicada en que tal uso contraviene restricciones de uso y edificación, las cuales gravan los solares en cuestión.

I

Allá para el año 1985, el Banco Nacional de Puerto Rico inició un proyecto de construcción de un edificio comercial en los solares número 176 y 178, respectivamente, localizados éstos en la Avenida Franklin D. Roosevelt en Hato Rey[1]; ello con el propósito de operar allí una de sus sucursales bancarias. Ambos solares colindan por la parte de atrás, o parte sur, con la Urbanización Juan B. Huyke, en específico con los solares número 179 y 181, respectivamente, de la calle José Padín, perteneciente a la referida Urbanización. Algún tiempo después, durante el año 1987, el Banco Nacional adquirió mediante compraventa el solar número 179 antes mencionado. Tal solar se encuentra clasificado por la Junta de Planificación de Puerto Rico bajo el distrito de zonificación R-3, Distrito Residencial Tres. Posteriormente, el 2 de septiembre de 1992, luego de la correspondiente solicitud, la Administración de Reglamentos y Permisos, en adelante A.R.P.E., le extendió al Banco Nacional permisos de uso y de construcción, con el fin de que éste último pudiera construir y operar en el mencionado solar un estacionamiento para los clientes de la sucursal. Ello no obstante, nada hizo al respecto el Banco Nacional.

A principios del año 1994, y luego de respectivas transacciones al efecto, el Banco Santander de Puerto Rico adquirió mediante compraventa todos los activos del Banco

---

[1] Todos los solares comprendidos en esa hilera que colinda por el norte con la Ave. Roosevelt, se encuentran clasificados por la Junta de Planificación del Estado Libre Asociado de Puerto Rico bajo el distrito de zonificación C-2, Distrito Comercial Central Intermedio.

Nacional, por lo que éste pasó a convertirse en propietario de la sucursal localizada en la Avenida Franklin D. Roosevelt, y del mencionado solar número 179 de la Urb. Huyke, colindante con la misma. Con el propósito de expandir sus servicios y de culminar el proyecto iniciado por el Banco Nacional, el Banco Santander adquirió el solar número 181 de la referida calle José Padín. Este solar queda adyacente al número 179 previamente adquirido por el Banco Nacional.

Luego de ello, el Banco Santander obtuvo los correspondientes permisos de construcción y de uso por parte de A.R.P.E. para unir ambos solares, número 179 y 181, y operar, con mayor capacidad, el estacionamiento que antes había contemplado el Banco Nacional. Se comenzó el proyecto de construcción, demoliendo las estructuras de vivienda construidas en ambos solares, se cubrió el terreno de asfalto, se instaló un portón eléctrico de seguridad y, desde entonces, el Banco Santander comenzó a operar y a utilizar el área como estacionamiento para los clientes de la sucursal. Este se encuentra abierto a los clientes y empleados del Banco de 8:30 a.m. a 4:00 p.m., con acceso vehicular desde la Ave. Roosevelt y salida, a través del referido portón eléctrico, hacia la calle José Padín. Los días jueves, viernes y sábado, después de las 4:00 p.m., el Banco destaca un guardia de seguridad en el estacionamiento para la protección de sus clientes.

El 22 de agosto de 1997, la Asociación Pro Bienestar Vecinos de la Urbanización Huyke, en adelante Asociación, radicó una demanda, sobre interdicto permanente, ante la Sala

Superior de San Juan del Tribunal de Primera Instancia en solicitud de orden contra el Banco para que desistiera del uso comercial, como estacionamiento, que le ha estado dando a los solares localizados en la calle José Padín. [2] Alegó la Asociación, como fundamento de su solicitud, que ambos solares están sujetos a unas condiciones restrictivas de uso y edificación que limitan el uso a darse a los solares comprendidos en la Urb. Huyke para fines exclusivamente residenciales. Sostuvo, además, que dicho uso afecta el bienestar y seguridad de los vecinos, y que va en contra del interés propietario de los residentes de la Urbanización.

En apoyo a tales contenciones, la Asociación hizo referencia a la existencia, repetimos, de unas restricciones constituidas por el desarrollador original de la Urbanización, contenidas en la Escritura Pública Número 65, sobre Constitución de Condiciones Restrictivas de Edificación de la Urbanización Huyke, otorgada ante el Notario Público Miguel Marcos Contreras, allá para el día 9 de septiembre de 1946. La mencionada escritura consta inscrita, a su vez, como nota al margen de la inscripción de la finca principal urbanizada en el Registro de la Propiedad de San Juan, con el fin de que todos los solares comprendidos en la Urbanización, y

---

[2] Debemos señalar que, previo a la radicación de dicho recurso, ya la Asociación había instado una querella ante A.R.P.E. El 29 de febrero de 1996, el oficial examinador a cargo de la misma recomendó no revocar los permisos otorgados y conceder al Banco una "excepción", permitiendo así la utilización de ambos solares como estacionamiento.

segregados de ésta, quedaran afectos a las referidas restricciones.[3]

La parte demandada en su contestación a la demanda alegó, como defensa afirmativa, que las servidumbres en equidad constituidas en virtud de las referidas condiciones restrictivas se habían extinguido por los cambios radicales ocurridos en el vecindario, por lo que mantenerlas vigentes resultaba irrazonable y opresivo.

Luego de varios trámites procesales, incluyendo, entre otros, una inspección ocular de los solares en cuestión, así como de aquellas zonas periféricas a la Urb. Huyke, el tribunal

---

[3] Entre estas condiciones, y en lo pertinente al caso de autos, se encuentran las siguientes, a saber:

1) la edificación que se levante en cada uno de los solares será dedicada única y exclusivamente para fines de residencia y no más de dos familias, entendiéndose que cuando una edificación se construya para albergar dos familias, ésta será de dos plantas cada una de las cuales albergará una familia distinta.
2) No se permitirán casas mixtas, parte para residencia y parte para almacén o comercio, así como tampoco se permitirán garajes de maderas, zinc o material alguno que no fuera concreto armado o bloques de hormigón también con techo de azotea o tejas; pudiéndose construir el garaje para uno o dos vehículos si así lo desea.
7) Las presentes condiciones restrictivas de edificación estarán vigentes sin limitación de término o tiempo alguno.
8) La contravención de estas restricciones y condiciones por parte de cualquier dueño de un solar, o por sus herederos, sucesores en título o causahabientes determinarán al (sic) quebrantamiento del contrato y dará derecho a los demás propietarios, o a uno cualquiera de ellos, a establecer la reclamación judicial correspondiente para el cese de tal perturbación o contravención. Los dueños de esta urbanización ceden desde ahora dicho derecho sin responsabilidad alguna de su parte en cuanto a los efectos de esta cesión.

de instancia denegó el interdicto solicitado por la Asociación. El foro primario adujo tres fundamentos en apoyo de su dictamen. En primer lugar, determinó que la utilización del área como estacionamiento está autorizada por la sección 84.01(2) del Reglamento de Zonificación de Puerto Rico, Reglamento de Planificación Núm. 4, del 16 de septiembre de 1992, número 4844 de la Junta de Planificación.[4] En segundo término, sostuvo que los cambios sociales y circunstanciales ocurridos en el área periférica a los solares en cuestión, provocaron la extinción de las servidumbres en equidad constituidas por el desarrollador original de la Urbanización. Por último, determinó que, de una lectura de la escritura de constitución de condiciones restrictivas, no se desprende claramente la prohibición a los efectos de la actividad realizada por la parte demandada; esto es, sostuvo que la parte demandante lo que pretendía era impedir un uso que no había sido especificado en la escritura ni constaba particularmente inscrito en el Registro de la Propiedad.

Insatisfecha, la Asociación apeló ante el Tribunal de Circuito de Apelaciones.[5] Cumplimentados los trámites

---

[4] Tal reglamento era el vigente al momento de A.R.P.E. conceder la "excepción" al Banco. Aun cuando no hay constancia alguna en el expediente de autos, entendemos que A.R.P.E. basó su decisión en el mismo al permitirle al Banco utilizar los solares como estacionamiento de la sucursal. Dicho Reglamento fue derogado por el Reglamento de la Junta de Planificación número 6211 de 5 de noviembre de 2000. La sección citada, ahora sección 74.01(2), no sufrió enmienda alguna.

[5] En su escrito alegó que el tribunal de instancia incidió:

"...al interpretar que los cambios radicales en la periferia de la Urbanización Huyke invalidaban las condiciones restrictivas impuestas por la

apelativos pertinentes, el tribunal apelativo intermedio confirmó el dictamen emitido por el tribunal de instancia. Sustentó tal determinación en prácticamente los mismos fundamentos esgrimidos por instancia. Expuso, además, que, de una interpretación razonable del texto y del contexto de la condición restrictiva en controversia, se desprende que ésta sólo limita el uso de las edificaciones que se erijan en los solares, por lo que ello no impide el uso de tales solares para estacionamiento.

Inconforme, la Asociación acudió en revisión --vía certiorari-- ante este Tribunal, imputándole al foro apelativo intermedio haber errado:

> "...al hacer una interpretación restrictiva de las condiciones establecidas en la servidumbre en equidad y guardar silencio al no pasar juicio sobre las actuaciones de la parte recurrida al obviar unas restricciones que surgen del Registro de la Propiedad, demoliendo estructuras para validar el uso comercial no permitido."

Expedimos el recurso. Contando con la comparecencia de ambas partes, y estando en posición de resolver el mismo, procedemos a así hacerlo.

## II

En esencia, nos corresponde interpretar, en primer lugar, el texto utilizado por el desarrollador original de la Urb. Huyke al constituir, en escritura pública, las condiciones

---

servidumbre en equidad inscrita en el Registro de la Propiedad y al interpretar que la condición restrictiva no ha sido violada y al no poner en |vigor la servidumbre en equidad;
...al interpretar restrictivamente la definición de la palabra edificación."

restrictivas aquí en controversia, así como el alcance de las mismas. Debemos evaluar, además, la validez y subsiguiente vigencia de tales servidumbres ante la ocurrencia de cambios ocurridos en la periferia de la referida Urbanización; esto es, verificar si, de hecho, han tenido lugar suficientes cambios como para extinguir la servidumbre en equidad aquí impuesta. Dicho de otro modo, determinar qué tipo o clase de cambios tienen el efecto de alterar la efectividad y vigencia de la misma. En virtud de ello, debemos evaluar, además, el efecto o alcance que tiene la concesión administrativa, por parte de A.R.P.E., de una "excepción" al uso reglamentario dispuesto por la Junta de Planificación para los solares en cuestión, *vis a vis* el contenido de las referidas restricciones de índole privada. Veamos.

### III
#### A

De entrada, debemos determinar si las restricciones en controversia, en efecto, cumplen o no con los requisitos que hemos establecido para que se configure una servidumbre en equidad como tal.

La figura jurídica de la servidumbre en equidad es, en nuestro ordenamiento, una de origen jurisprudencial. A diferencia de otras figuras de origen civilista, tal figura angloamericana fue adoptada por este Tribunal a principios del siglo pasado, ello al resolver Glines v. Matta, 19 D.P.R. 409 (1913). En dicho caso se reconoció la existencia de dicha figura en Puerto Rico, más, sin embargo, el Tribunal no realizó

un análisis extenso de la misma, limitándose simplemente a adoptarla y sostener su aplicación a través del recurso del "injunction".[6] Este Tribunal ha "expandido" tanto la propia figura de la "servidumbre en equidad" como los contornos de su aplicación, ello en virtud de nuestra realidad jurídica de trascendencia civilista.[7] A esos fines, examinamos brevemente los casos de Lawton v. Rodríguez, 35 D.P.R. 487 (1926); Fiol v. López de la Rosa, 46 D.P.R. 749 (1934); y Colón v.San Patricio Corp., 81 D.P.R. 242 (1959), entre otros.

En Colón v. San Patricio Corp., ante, brindamos una definición concreta de lo que constituye una "servidumbre en equidad" en nuestro ordenamiento. Al resolver que las restricciones, condiciones y limitaciones respecto al uso de la finca allí en cuestión, constituían lo que en nuestro ordenamiento se conoce como "servidumbre en equidad", advertimos que éstas son "cláusulas restrictivas 'a beneficio de los presentes y futuros adquirentes' que imponen cargas o gravámenes especiales, como parte de un plan general de mejoras

---

[6] Véase, Fermín L. Arraiza Navas y José R. Roqué Velásquez, *Las servidumbres en equidad, las defensas en equidad y el Registro de la Propiedad en el Derecho Puertorriqueño*, 32 Vol. 1 Rev. Jur. U.I.P.R. 35 (1997).

[7] "Las condiciones restrictivas que nos ocupan se denominan "equitable servitudes" en el derecho anglosajón. Aunque intrínsecamente no tienen nada de equidad, se les llamó así en aquel derecho debido a que por motivo de la rigidez del antiguo derecho común anglosajón hubo que recurrir judicialmente a la *equity* para proveerle cauces jurídicos a estos derechos reales. En nuestro derecho no tenemos ese problema. Se trata de derechos reales, lo cual cae cómodamente dentro de nuestro Derecho Civil. En el contrato de compraventa de un solar afectado por condiciones restrictivas éstas son parte del contrato; así vende quien vende y así compra quien

para el desarrollo de una urbanización residencial en esa finca...". Id., a la pág. 250. Al regularse las mismas por los principios de equidad del derecho angloamericano, mediante una servidumbre de tal clase, el dueño de una propiedad a urbanizarse puede constituir por sí solo un gravamen sobre su fundo propio.[8]

En Lawton v. Rodríguez, ante, establecimos los requisitos esenciales que deben de tener lugar para su validez. Allí expresamente se dispuso que "para su validez y eficacia se requiere que las limitaciones sean razonables, se establezcan como parte de un plan general de mejoras, consten de forma específica en el título y se inscriban en el Registro de la Propiedad." Id., a la pág. 494; Carrillo v. Camejo, 107 D.P.R. 132, 137 (1978).

Las servidumbres en equidad constituyen cargas o gravámenes reales, por lo que, crean derechos reales inscribibles en el Registro de la Propiedad y, una vez son inscritas, constituyen derechos reales oponibles *erga omnes*. Baldrich v. Registrador, 77 D.P.R. 739 (1954); Asoc. V. Villa Caparra v. Iglesia Católica, 117 D.P.R. 346 (1986). Ello configura, entre los predios afectados, "una relación de

---

compra." Sands v. Ext. Sagrado Corazón, 103 D.P.R. 826, 831 (1975).

[8] Sobre ese aspecto, véase: *Las servidumbres en equidad, las defensas en equidad y el Registro de la Propiedad en el Derecho Puertorriqueño,* ante, pág. 40, a saber; "las servidumbres en equidad consisten en cláusulas de índole restrictivas que se crean unilateralmente por el urbanizador en y para el beneficio de los presentes y futuros adquirentes de los solares y casas que comprenden una urbanización, las cuales condiciones o cláusulas restrictivas imponen cargas o gravámenes especiales, como parte de una plan general de mejoras."

servidumbres recíprocas, pues cada lote o solar es predio dominante, a la vez que sirviente, con relación a los demás lotes o solares de la urbanización." Asoc. V. Villa Caparra v. Iglesia Católica, ante, a la pág. 353; citando a José R. Vélez Torres, Curso de Derecho Civil, San Juan: Ed. Art Printing, 1983, T.II, pág. 416.

Dada su naturaleza de derecho real inscribible, el conocimiento de las limitaciones y condiciones impuestas en virtud de la misma, se imputa a todo presente y futuro adquirente de la propiedad que ésta grava. Debido a su constitución unilateral por el urbanizador y la subsiguiente inscripción, ciertamente tales condiciones restringen y limitan las facultades de los futuros adquirentes. Sabater v. Corp. Des. Económico, 140 D.P.R. 497 (1997); Asoc. V. Villa Caparra v. Iglesia Católica, ante. En reiteradas ocasiones hemos expresado que el Registro de la Propiedad es público para quienes tengan interés en conocer sobre el estado jurídico de los bienes y derechos reales inscritos. García v. Durand, 114 D.P.R. 440 (1983). Por consiguiente, en cuanto a las limitaciones de uso y edificación de una propiedad, el Registro es el "notificador" por excelencia sobre tal tipo de restricción a terceras personas interesadas.

De conformidad con ello, hemos expresado que cuando una persona tiene pleno conocimiento de las limitaciones de uso de una propiedad, nunca debe permitírsele llevar a cabo la conducta o actuación prohibida por tales restricciones. A esos efectos, establecimos o elaboramos la doctrina del "daño

autoinfligido". Véase: <u>Asoc. C.D. Octubre v. J.A.C.L.</u>, 116 D.P.R. 326 (1985); <u>Asoc. Resid. Baldrich v. J.P.</u>, 118 D.P.R. 759 (1987). A medida que se obtenga conocimiento sobre el tipo de condición a la cual esté afecta la propiedad, toda clase de daño producto de alguna actuación en contravención a la misma, tendrá al actor como único causante de su perjuicio. A fin de cuentas, en tales casos, el Registro de la Propiedad, dado su principio cardinal de publicidad, otorga pleno conocimiento al que adquiere un terreno que está sujeto a la servidumbre en equidad o restricción.[9]

Hemos expuesto, además, que, la creación, contenido y alcance de estas cargas o gravámenes reales <u>se rigen por los principios del derecho de equidad</u>. De conformidad con tales principios, las restricciones privadas que constituyen servidumbre en equidad, se modifican o extinguen en los siguientes casos: 1) por convenio de los interesados; 2) por efecto del tiempo o por realizarse la condición si las restricciones así se han constituido;  3) por confusión; 4) por renuncia o abandono de los propietarios que reciben los beneficios de la servidumbre; 5) por expropiación forzosa si los gravámenes son incompatibles con el uso público del inmueble expropiado; <u>y, 6) cuando cambios radicales del vecindario no sólo hacen la restricción irrazonable y opresiva para el dueño del predio sirviente, sino también destruyen el valor que la restricción tenía para el dueño del predio</u>

---

[9] Sobre esto véase, Fermín L. Arraiza Navas y José R. Roqué Velázquez, *Las servidumbres en equidad, las defensas en*

dominante, por lo cual resulta en verdad imposible alcanzar los fines que perseguía la servidumbre. Véase: Colón v. San Patricio Corp., ante, págs. 261-262; Asoc. V. Villa Caparra v. Iglesia Católica, ante, a la pág. 354.

Aparte de los casos en que la servidumbre queda modificada o extinguida, según las circunstancias indicadas en el párrafo anterior, los dueños de predios sujetos a servidumbres en equidad tienen disponible el recurso del injunction para hacer efectivos sus derechos e impedir violaciones a las limitaciones impuestas. Basta probar la violación de la servidumbre para que se justifique la utilización del injunction, ello sin necesidad de que se prueben daños reales o perjuicios sustanciales. Colón v. San Patricio Corp., ante, a la pág. 259.

Acorde con lo anterior, contra el referido recurso, el derecho le reconoce a la parte demandada poder oponer todas la defensas que le otorgan los principios en equidad; se le reconocen como defensas varios motivos y circunstancias referentes a "las equidades personales entre litigantes". A manera de ejemplo, el consentimiento; conciencia impura; incuria; e impedimento. Asoc. V. Villa Caparra v. Iglesia Católica, ante, págs. 353-354.

En el presente caso se han dado los requisitos esenciales para que se configure una servidumbre en equidad, según nuestro ordenamiento. A saber, de un análisis de las restricciones aquí en controversia, se desprende que éstas son razonables; se

_____

*equidad y el Registro de la Propiedad en el Derecho*

establecieron como un plan de mejora por el desarrollador original y dueño de los predios gravados con el fin de limitar el uso de las propiedades a uno residencial; constan de forma específica en el título; y están inscritas en el Registro de la Propiedad. Ello no está en controversia.

Dicha conclusión, sin embargo, no dispone del asunto hoy ante nuestra consideración. A la luz de los pronunciamientos esbozados y, según mencionáramos previamente, debemos interpretar el texto utilizado por el desarrollador original de la Urb. Huyke al constituir, en escritura pública, tales condiciones restrictivas, así como el alcance de las mismas.

Desde Sands v. Ext. Sagrado Corazón, 103 D.P.R. 826, 827 (1975), establecimos que las condiciones restrictivas en urbanizaciones residenciales tienen el propósito de preservar la belleza, la comodidad y la seguridad del reparto residencial según éste es concebido por sus arquitectos y constructores.[10] A renglón seguido reiteramos en dicho caso que tales condiciones restrictivas, "las cuales limitan las facultades de los futuros adquirentes de los solares y de las viviendas en cuanto a hacer obras nuevas y efectuar cambios en las ya hechas", hacen más agradable y segura el área residencial para las familias que allí deseen vivir. Id.

Respecto al alcance de tales limitaciones, precisamente en cuanto éstas restringen el uso y/o destino de las propiedades gravadas, el criterio más importante al determinar

---

Puertorriqueño, ante.

[10] Véase, además, Sabater v. Corp. Des. Eco., ante, a la pág. 506.

sobre tal alcance y sobre la designación de un "uso" es que, mediante el lenguaje utilizado, <u>se le informe debidamente y sin ambigüedades a los nuevos adquirentes y terceros, sobre lo que se les está o no está permitido realizar.</u>[11]  Ello se debe precisar e identificar claramente en términos amplios y por definiciones de categorías como vivienda o uso comercial, para que tanto los nuevos adquirentes como los terceros, sepan a qué atenerse con respecto a las limitaciones impuestas a su derecho de propiedad.  La limitación debe constituir un aviso suficiente y adecuado, de manera que toda persona, al adquirir alguna de tales propiedades, pueda tomar una decisión informada antes de advenir dueño de la misma.

En cuanto a tal aspecto, es preciso destacar que en el contrato de compraventa de un solar y/o propiedad afectado por condiciones restrictivas, éstas son parte inherente del contrato. <u>Sand's v. Ext. Sagrado Corazón</u>, ante, a la pág. 831; debido a la naturaleza beneficiosa que dichas condiciones tienen para las áreas residenciales, las mismas son parte del valor que compra el adquirente de la residencia y por el cual paga. Id., a la pág. 832. En consecuencia, el adquirente tiene la justificada expectativa de que dichas condiciones van a ser respetadas.

De un análisis del expediente de autos surge que tanto el Banco Nacional, en aquel entonces, al adquirir el primer solar, como el Banco Santander al comprar el segundo, lo hicieron cuando en éstos todavía existían dos viviendas

---

[11] Id., véase además <u>Cond. S.J.H. Centre v. P.R.F. Inc.</u>, 133

respectivamente. Ciertamente, cuando el Banco recurrido adquirió ambas propiedades estaba consciente de que éstas pertenecían a una zona residencial. La parte demandada tuvo, además, plena oportunidad de conocer sobre las condiciones restrictivas que gravaban el terreno, ello a través del Registro y de la correspondiente escritura. No podemos avalar la posición a los efectos de que la condición restrictiva reseñada únicamente afecta el uso de las edificaciones y no el uso de los solares per sé. Resultaría un tanto absurdo interpretar que el desarrollador original de la Urbanización en cuestión hubiese querido limitar el alcance de las restricciones por él mismo impuestas exclusivamente al acto de edificar y levantar estructuras para fines únicamente residenciales, sin pretender a su vez impedir cualquier otro uso de los lotes que no fuera residencial. Ello obvia, por demás, todo tipo de correlación existente entre los conceptos de uso de terrenos y edificaciones dentro del campo de la planificación urbana e incluso dentro del ámbito del derecho civil.

El uso como estacionamiento de los solares aquí en controversia ciertamente constituye un uso comercial, no residencial, dirigido a servir los intereses comerciales del banco; intereses que, de hecho, son totalmente ajenos a los intereses de los residentes de la Urbanización. Precisamente, surge de los documentos que obran en el expediente de autos que la intención del desarrollador original fue, desde un

---

D.P.R 488, 504 (1993).

principio, el que se mantuviera el fin residencial de la Urbanización y de que todos los solares de las misma estuviesen afectos a las restricciones en cuestión. Por consiguiente, resulta ilógica una interpretación que permitiera darle un uso comercial a los solares bajo el pretexto de que no existe edificación alguna construida sobre los mismos. El Banco demandado no puede utilizar tal argumento como subterfugio para obviar las restricciones impuestas y pretender oponer como justificación el que ambos lotes se encuentran "vacíos", ó "sin estructuras", cuando la realidad es que se han acondicionado los lotes como estacionamiento y ambos sirven propósitos comerciales.

El Banco demandado pretendió efectuar, de facto, una conversión del uso de los solares, de residencial a comercial, obviando las restricciones privadas que conocía los gravaban. Tales restricciones informan clara y debidamente a cualquier futuro adquirente que cualquier uso no residencial está vedado. Podemos incluso advertir que las referidas limitaciones son de naturaleza, más bien, excluyente, y proscriben cualquier tipo de construcción no residencial, incluyendo la utilización de los mismos como un estacionamiento. Aun cuando tal estacionamiento no sea una "estructura" o "edificación" que se erija sobre un solar per sé, ciertamente, para habilitar el área, el Banco llevó a cabo obras de construcción incluyendo, entre otras, la cobertura del terreno con asfalto, y la subsiguiente instalación de verjas de acero en conjunto con un portón eléctrico.

Tal proceder da al traste con la intención de aquellas personas que constituyeron las restricciones de que el uso, tanto de las edificaciones como de los solares, donde ubiquen o no tales edificaciones, fuese para fines residenciales. Al evaluar la restricción en controversia en su justa perspectiva, y en conjunto con las demás, se desprende que el propósito esencial de su existencia es el de evitar la proliferación de usos <u>no</u> residenciales o comercios dentro de la zona comprendida por la Urbanización. <u>Erró, en consecuencia, el foro apelativo al concluir que la restricción no prohibía el uso no residencial de los solares</u>.

### C

Validada la restricción en cuanto a la prohibición referente al uso no residencial de los solares sin estructuras, <u>debemos entonces determinar si tal limitación ha perdido vigencia ante los cambios ocurridos en la zona</u>.

Según reseñáramos previamente, toda servidumbre en equidad puede extinguirse o modificarse cuando, entre otras circunstancias, cambios radicales del vecindario no sólo hacen la restricción irrazonable y opresiva para el dueño del predio sirviente, sino también destruyen el valor que la restricción tenía para el dueño del predio dominante, razón por la cual resultaría imposible alcanzar los fines que perseguía la servidumbre. <u>Colón v. San Patricio Corp.</u>, ante; <u>Asoc. V. Villa Caparra v. Iglesia Católica</u>, ante.

El Banco demandado sostiene, como defensa, que los cambios ocurridos en la periferia de la Urbanización Huyke,

entiéndase con ello los alrededores de la Ave. Roosevelt, extinguieron la servidumbre en cuestión.[12] En el pasado hemos reiterado que la extinción de las servidumbres por motivo o causa de cambios radicales cobra razón de ser cuando el cambio ocurrido sea de tal naturaleza que haya dejado sin valor alguno el convenio en cuanto a la parte dominante residencial. Asoc. V. Villa Caparra v. Iglesia Católica, ante; Macatee v. Biascochea, 37 D.P.R. 1 (1927).

Así pues, hemos hecho claro que, de ordinario, tal defensa se configura cuando: 1) el cambio(s) radical(es) haya(n) convertido la restricción en una carga irrazonable y opresiva para el dueño del predio sirviente; 2) haya destruido el valor que de otro modo tendría la restricción para los dueños de los predios dominantes; y 3) frustre por completo y permanentemente el propósito u objetivo de la restricción. Colón v. San Patricio Corp., ante, a la pág. 265. Indicamos en el citado caso que es preciso se cumplan los tres requisitos mencionados para que se justifique poner fin a la restricción.

Es necesario que los cambios del vecindario sean de carácter tan radical y permanente, que lleguen al punto de impedir sustancialmente la consecución de las ventajas y de los beneficios establecidos por la servidumbre. Olmeda Nazario v. Sueiro, 123 D.P.R. 294 (1989). Adviértase que el análisis a seguir lo es el de, si por razón de cambios radicales en las

---

[12] "La extinción de las servidumbres por motivo de cambios radicales puede ser alegada como defensa ante una acción de *injunction* o de una sentencia declaratoria solicitando que se declare la modificación o extinción de las restricciones."

condiciones del vecindario, resulta imposible lograr el propósito que persigue la servidumbre en equidad. Es, entonces, cuando ésta queda modificada o extinguida. Id. Por otra parte, el peso de la prueba para establecer que ha ocurrido un cambio en el vecindario le corresponde al que ataca la validez de la servidumbre en equidad.

Al realizar dicha tarea interpretativa hemos expresado que pueden considerarse tanto los cambios acaecidos dentro del área restringida como las alteraciones sobrevenidas en los terrenos que la rodean. En cuanto a este aspecto, desde que resolvimos el citado caso de Colón v. San Patricio Corp., ante, indicamos --a la página 265-- que conjuntamente con el cumplimiento de los tres requisitos antes esbozados, se requiere que:

> "...los cambios del vecindario tienen que afectar en la forma antes señalada a la totalidad de los solares comprendidos dentro del área restringida. No basta que una parte de dicha área, situada al borde o a orillas del distrito que no está sujeto a las restricciones, sufra el impacto de los referidos cambios, si hay solares o porciones interiores del área restringida que todavía pueden recibir las ventajas y beneficios establecidos a su favor mediante la servidumbre equitativa. Es decir, las restricciones no pueden extinguirse mediante un proceso gradual de abrogación que empieza con los solares al borde del área restringida y se extiende paso a paso hasta las porciones o solares situados en el centro de los terrenos restringidos..." (Énfasis suplido.)

A tenor con lo anterior, hemos advertido que los cambios en los terrenos o predios restringidos tienen más peso que los ocurridos fuera o en los que los rodean. Véase: Asoc. V. Villa

---

Asoc. V. Villa Caparra v. Iglesia Católica, ante, a la pág. 354.

Caparra v. Iglesia Católica, ante. "Si el área gravada no se ha deteriorado, de ordinario no debemos dejar sin efecto una restricción porque han ocurrido cambios en la periferia." Id., a la pág. 356. De hecho, a medida que los contornos de la planificación urbana y comercial han ido evolucionando, tanto la jurisprudencia de este Tribunal como la norteamericana, ha reseñado varios factores que se deben de tomar en consideración a la hora de evaluar el efecto que tengan o no los cambios con respecto a cierta(s) restricción(es) privada(s). Ello con el propósito de poder determinar si, en efecto, se ha modificado o, incluso, extinguido la servidumbre cuya vigencia esté en controversia.

Así, se ha considerado: 1) el tamaño del área sujeta a las restricciones; 2) la localización de los cambios ocurridos con respecto al área restringida; 3) el tipo de cambio ocurrido; 4) cambios en la infraestructura, con particular referencia a los patrones de tránsito; 5) la extensión y naturaleza de los usos comerciales, industriales en las áreas circundantes; 6) valor de los terrenos residenciales en comparación con los comerciales; 7) término y duración de las restricciones; 8) sí las restricciones continúan siendo beneficiosas o no para los dueños de los solares afectados; 9) el cambio ocurrido en la zonificación del área y sus alrededores.[13]

---

[13] Fermín L. Arraiza Navas y José R. Roqué Velázquez, *Las servidumbres en equidad, las defensas en equidad y el Registro de la Propiedad en el Derecho Puertorriqueño*, ante, págs. 43-44; Asoc. V. Villa Caparra v. Iglesia Católica, ante, págs. 356-57; Holmquist v. D-V, Inc., 563 P.2d 1112 (Ct. Apel. Kan.

Acorde con lo anterior, hemos indicado que, al evaluar tales factores, se debe tomar en cuenta que un área pequeña es más vulnerable y sus solares están más expuestos a los efectos de los cambios en la periferia; ello ciertamente repercute mayormente en tales sectores que en los más grandes. Asimismo, mientras más cerca se encuentren las zonas que han cambiado, mayor el impacto.

Ciertamente, los casos que mayores controversias acarrean son aquellos en que, como en el presente, los cambios han afectado la parte colindante a los lotes restringidos por la servidumbre en equidad, o que han afectado sólo una parte de los lotes restringidos. Claro está, los que están a lo largo del borde del área restringida han perdido su valor residencial pero han adquirido valor comercial.Por otra parte, aquellos solares localizados al interior conservan su valor residencial.

Según nos ilustran Fermín Arraiza Navas y José R. Roqué Velázquez, ante tal tipo de situación, "son pocos los casos en que se ha rechazado poner en vigor la restricción de la servidumbre en equidad. El peso que tiene el demandado es tan grande como si el cambio hubiese afectado el área entera sujeta a la servidumbre en equidad. La razón para esto es que sólo

---

1977), <u>Lebo v. Jonson</u>, 349 S.W.2d 744, 749 (Ct. Apel. Tex. 1961).

Véase además, Michel J. Godreau y Ana Isabel García Saúl, *Servidumbre y Conservación,* 67 (2) Rev. Jur. U.P.R. 249, 304-05 (1998); Comment, *Termination of Servitudes: Expanding the Remedies for 'Changed Conditions',* 31 U.C.L.A. L. Rev. 226, 236-237 (1983).

de esta forma es posible defender y preservar el valor de los lotes internos residenciales aún no afectados."[14]

En el caso de autos, el Banco demandado alega que, aún en el supuesto de que se concluya que la restricción impide el uso no residencial de los solares gravados[15], entonces debemos resolver que los cambios ocurridos en la zona extinguieron la misma. Apoya tal argumento en el hecho de que han habido ciertos cambios en la zonificación de los solares colindantes con la Ave. Roosevelt, y que, incluso, ciertos predios localizados dentro de la Urbanización Huyke están siendo utilizados para propósitos comerciales, aun cuando éstos se encuentran clasificados como Distritos Residenciales, R-3.

Por otra parte, la Asociación alega que los solares que el Banco alega están siendo utilizados para fines no residenciales, en realidad están vacantes, incluso marcados en los mapas de zonificación como lotes residenciales vacantes, R(V). En síntesis, sostiene que, en comparación con

---

[14] Fermín L. Arraiza Navas y José R. Roqué Velázquez, *Las servidumbres en equidad, las defensas en equidad y el Registro de la Propiedad en el Derecho Puertorriqueño*, ante, págs. 43-44; citando además a Mc.Clintock, *Handbook on Equity,* 2nd, ed., sec. 128, 1948; Comment, *Termination of Servitudes: Expanding the Remedies for 'Changed Conditions',* ante, pág. 227; Marra v. Aetna Const. Co., 101 P.2d 490 (Cal. 1940), entre otros.
      "El mero hecho de que la propiedad en controversia obtenga un valor económico mayor al no tener las restricciones que la impone la servidumbre en equidad, no es decisivo a la hora de determinar sobre si ha ocurrido un cambio en el vecindario. Tampoco será suficiente no decisivo el hecho de que un lote en particular haya cambiado y no pueda ser residencial nuevamente, para demostrar o alegar que hubo un cambio en el vecindario." Id.
[15] Tal como concluimos en el acápite anterior.

el total de solares comprendidos dentro del área restringida, la gran mayoría de éstos están siendo utilizados como vivienda.

De un examen del expediente de autos, incluyendo dos mapas de zonificación del área --uno de vigencia de 28 de diciembre de 1949 y otro con vigencia de 13 de julio de 1998-- de un estudio de cambios de la Urbanización[16], entre otros documentos, se desprende que la hilera de solares que colinda directamente con la Ave. Roosevelt fue rezonificada y actualmente cae bajo una clasificación de Distrito Comercial, C-2. Ninguno de esos solares --un total de veintiséis (26) agrupados en veintidós (22)-- actualmente forma parte de la Urbanización. Surge de ambos mapas, además, que todos los solares que caen dentro de la zona comprendida por la Urbanización y que están sujetos a las restricciones privadas, aún mantienen, desde el año 1949, una clasificación residencial, R-3.[17]

Por otro lado, tenemos que, de un total de ciento ocho (108) solares[18] examinados en el referido estudio de cambios,

_____

[16] Estudio realizado por el Ingeniero Civil, Camilo Almeyda Eurite, de fecha de 11 de septiembre de 1998.

[17] El propósito del Distrito R-3 está especificado en el Reglamento de Zonificación como aquel distrito de densidad poblacional intermedia establecido para clasificar áreas residenciales desarrolladas o que puedan desarrollarse en donde se permitirán viviendas en solares de trescientos (300) metros cuadrados o más. Reglamento de Planificación Núm. 4, Reglamento de Zonificación núm. 6211 de 5 de noviembre de 2000, Subsección 13.01.

[18] Se llevó a cabo un estudio que comprendió tales 108 solares. Todos éstos se encuentran ubicados dentro de un área cuyos límites son la Ave. F.D. Roosevelt por el Norte; los solares frente a la calle Juan B. Huyke por el Sur; la calle Fernando Primero por el Este; y los solares con frente a la calle Unión por el Oeste.

veintidós (22) solares hoy día, tienen una zonificación comercial; tal número comprende el 20% de los solares estudiados. Precisamente esos veintidós (22) solares son, en específico, los que comprenden la hilera que colinda con la Ave. Roosevelt, solares que quedan al borde del área restringida por la servidumbre. El estudio indica, además, que del referido total de ciento ocho (108) solares del sector, treinta y siete (37) no tienen uso residencial, lo que significa que un 34% de los solares estudiados no están siendo utilizados para fines residenciales. Precisamente, dentro de tales treinta y siete (37), recordemos que veintidós (22) ubican en la hilera de la Ave. Roosevelt, zonificados como comerciales. Por lo que, a fin de cuentas, los quince (15) restantes, localizados dentro del área restringida, aunque clasificados como R-3, no se les está dando un uso *per se* residencial.

Al examinar el mapa de zonificación del 1998, surge que a la mayoría de esos quince (15) solares, en específico once (11) de éstos, <u>no se les está dando un uso residencial por razón de encontrarse vacantes</u>[19]; constan específicamente marcados en el referido mapa como R(V). En los predios de la calle José Padín, se encuentran, en específico, ocho (8) de éstos vacantes, más bien, con estructuras de vivienda vacantes o vacías. Por consiguiente, de la totalidad de los predios que forman parte de la Urbanización Huyke como tal, unos 97[20], sólo

---

[19] En todos ubican estructuras de vivienda vacantes.
[20] Según ello surge de la leyenda de la Urb. Huyke en el Mapa de Zonificación de 1998, Apéndice, a la pág. 106.

los quince (15) mencionados no tienen usos residenciales. Precisa destacar, además, que el propio perito de la parte demandada señaló en el referido estudio que, según el Plan de Ordenación del Municipio de San Juan, el área en controversia se vislumbra que siga teniendo carácter residencial.

A la luz de los datos y el análisis antes reseñado, somos del criterio que los cambios en la zona, acaecidos a través de los años, no han convertido las restricciones en controversia en unas obsoletas, injustas, irrazonables y opresivas como tampoco han disminuido el valor de dichas restricciones para los dueños de los predios dimanantes de la Urbanización Huyke.

El hecho de que haya ocurrido un desarrollo comercial en el área periférica no implica que se hayan abandonado las restricciones al uso de la propiedad que gravan el vecindario. Olmeda Nazario v. Sueiro, ante. Ello tampoco implica que hayan ocurrido cambios sustanciales en el uso de las propiedades que tengan que ser tolerados por la totalidad de los vecinos. Estos han expresado un interés evidente de evitar que se produzca un cambio de circunstancias en el sector que permita la proliferación de negocios en la calles de la Urbanización.

No debemos olvidar que las alteraciones o cambios capaces de modificar o extinguir una servidumbre en equidad tienen que ser tan radicales, como para que conviertan la restricción por ella impuesta en una lo suficientemente irrazonable u opresiva capaz de destruir el valor que tenía el convenio original. Recordemos que, en caso de que el área gravada no se haya

afectado, no debemos dejar sin efecto una restricción válidamente impuesta, porque hayan ocurrido cambios en la periferia o área circundante. Véase: Colón v. San Patricio Corp., ante; Asoc. V. Villa Caparra v. Iglesia Católica, ante.

El derecho propietario que pueda tener una persona, en el presente, el del Banco demandado, no incluye el derecho o facultad de explotar al máximo sus posibilidades en detrimento de otros intereses sociales. Asoc. Vecinos Park Side v. Junta, res. el 7 de octubre de 1999, 99 TSPR 149; intereses sociales que, de hecho, ignoraríamos si desatendiéramos el reclamo de los vecinos de la Urbanización Huyke de gozar y disfrutar de su propiedad en la forma y modo estipulado contractualmente al momento de adquirir sus viviendas.

Por consiguiente, resolvemos que tanto el Tribunal de Primera Instancia como el Tribunal de Circuito de Apelaciones incidieron al concluir que los cambios ocurridos en la periferia de la Urbanización Huyke extinguieron las restricciones privadas previamente impuestas sobre todos los predios segregados de la misma.

D

Ante la no ocurrencia de cambios radicales suficientes como para extinguir la servidumbre en cuestión, debemos evaluar entonces el efecto que tiene la concesión administrativa, por parte de A.R.P.E., de la "excepción" al uso reglamentario dispuesto por la Junta de Planificación para los solares en cuestión, permitiendo así la utilización de los solares para estacionamiento. En síntesis, los residentes de

un área clasificada como residencial, con densidad intermedia, intentan proteger la seguridad, integridad y el carácter de su vecindario contra la decisión administrativa de variar en la práctica tal uso, mediante un permiso discrecional. Ciertamente, tal concesión da al traste con  el contenido de las referidas restricciones de índole privada. Veamos.

En reiteradas ocasiones hemos expresado que es imprescindible tomar en consideración, al examinar la puesta en vigor de una restricción ante la ocurrencia de cambios radicales, cuál ha sido y es la política de la Administración de Reglamentos y Permisos y de la Junta de Planificación de Puerto Rico en cuanto a la zonificación y rezonificación de áreas, y en cuanto a la concesión, tanto de permisos regulares, como de los emitidos discrecionalmente como excepciones y variaciones a los reglamentos vigentes. "En nuestras circunstancias geográficas el Estado ha elaborado unos instrumentos de planificación para un desarrollo integral del uso de terrenos e inversiones que también deben ser considerados al poner en vigor estas restricciones." Asoc. V. Villa Caparra v. Iglesia Católica, ante, a la pág. 357.

En virtud de ello, debemos tener en mente que la Junta de Planificación es el organismo creado por ley para guiar el desarrollo integral de Puerto Rico y llevar a cabo la importante labor de planificar, zonificar, y establecer el uso de las distintas áreas del país. 23 L.P.R.A. sec. 62c. Negrón v. Junta, 139 D.P.R. 191 (1995). A tales efectos, el referido organismo ostenta la facultad de, no sólo preparar y adoptar

mapas de zonificación de la Isla, sino además de considerar y atender solicitudes de enmiendas a éstos. 23 L.P.R.A. sec. 62 j(5). Entre sus funciones está precisamente la de adoptar y aprobar los reglamentos necesarios para cumplir con la tarea que le fue delegada por la Legislatura, aprobando así, entre otros, el Reglamento de Zonificación de Puerto Rico, ante.

Cabe destacar además que el poder legislativo, al aprobar la Ley Orgánica de A.R.P.E., Ley Núm. 76 de 24 de junio de 1975, según enmendada, trasladó a la referida Administración las funciones de la Junta de Planificación respecto a la aplicación de los reglamentos en los casos individuales y la concesión de permisos de construcción. En virtud del referido estatuto se adoptó un esquema administrativo mediante el cual se transfirió a A.R.P.E. las funciones operacionales de la Junta de Planificación y se confirió a este organismo la facultad de aplicar y velar por el cumplimiento de las leyes y reglamentos de planificación. Asoc., C.D. Octubre v. J.A.C.L., 116 D.P.R. 326, 331 (1985); Junta de Planificación v. J.A.C.L., 109 D.P.R. 210, 214 (1979).

Entre las funciones más importantes de A.R.P.E. está la de aplicar los reglamentos de planificación adoptados por la Junta para el desarrollo, subdivisión y uso de terrenos, y para la construcción y uso de edificios, así como el cumplimiento de toda ley estatal, ordenanza o reglamentación de cualquier organismo gubernamental que regule la construcción el Puerto Rico. 23 L.P.R.A. sec. 71 *et seq.*; Negrón v. Junta, ante.

Sabido es que a A.R.P.E. se le ha concedido amplia discreción sobre la formulación y mantenimiento de la política pública a seguir con relación al trámite de la concesión y denegación de uso y la intención de proveer los remedios legales necesarios para poder velar por el cumplimiento efectivo de toda determinación que tenga por hacer. A.R.P.E. v. Ozores Pérez, 116 D.P.R. 816 (1986). Precisamente, entre los reglamentos que A.R.P.E. tiene que, por deber ministerial, aplicar y hacer cumplir, está el Reglamento de Zonificación de Puerto Rico, Reglamento de Planificación Núm. 4, de 5 de noviembre de 2000.[21]

Dicho Reglamento se aprobó con el propósito de guiar el uso y desarrollo de los terrenos y edificios, para asegurar y fomentar la salud, seguridad, moral, orden, estabilidad económica y bienestar general de los presentes y futuros habitantes de Puerto Rico, reconociendo así la necesidad de armonizar el deber del Gobierno de garantizar una adecuada utilización de los terrenos con el derecho de los ciudadanos al disfrute de su propiedad privada. La importancia que para el Pueblo representa la ordenada y adecuada utilización de nuestros terrenos y recursos está incluso constitucionalmente

---

[21] Según mencionáramos previamente, este Reglamento derogó el Reglamento de Zonificación de 16 de septiembre de 1992. En su Introducción se expresa que:

> [m]ediante la zonificación se establecen las normas esenciales sobre cómo y donde deben ubicarse las múltiples actividades sociales y económicas de Puerto Rico. A través de este proceso se clasifican los terrenos en zonas o distritos y se establecen para cada uno disposiciones específicas sobre el uso de los terrenos y sobre las obras y estructuras a permitirse.

reconocida. Ortiz v. Junta de Planificación, res. el 26 de septiembre de 2000; 2000 TSPR 139; Art. VI, Secs. 14 y 19 de la Constitución del E.L.A.

Con el propósito de instrumentar la política pública que le fue encomendada a A.R.P.E., en cuanto a la concesión de permisos, hemos reconocido que dicha agencia puede conceder permisos discrecionales utilizando uno de dos métodos, a saber: 1) vía "excepción o autorización directa", al amparo de lo dispuesto por la Sección 82.00 del Reglamento de Zonificación, ó, 2) autorizando una "variación", a la luz de lo dispuesto en la Sección 84.00 del mismo. Asoc. C.D. Octubre v. J.A.C.L., ante; Asoc. Vecinos Park Side v. J.P., ante.

En el citado caso de Asoc. C.D. Octubre v. J.A.C.L., ante, a la pág. 332, reiteramos la definición que sobre ambos términos expusiéramos en Quevedo Segarra v. J.A.C.L., 102 D.P.R. 87, 92 (1974): el término "variación" es aquel permiso mediante el cual se puede dedicar una propiedad a un uso prohibido por las restricciones impuestas en una zona o distrito; el término "excepción" se refiere a aquella autorización para usar la propiedad en cierto modo que de antemano el propio Reglamento de Zonificación admite y tolera, siempre que se cumpla con ciertas condiciones.

En lo pertinente a la controversia que hoy ocupa nuestra atención, expresamos en dicho caso que la concesión de "excepciones" es un medio para controlar ciertos usos que no son frecuentes pero que pueden tener un efecto adverso en el vecindario. Estas se conceden únicamente en casos expresamente

autorizados por el Reglamento y siempre sujetas a las condiciones en él prescritas. Id. El aspecto neurálgico en la concesión de excepciones es el de restringir cierto usos que resulten adversos, aún cuando no resulten ser incompatibles al carácter del vecindario. Tienen primacía en tal concesión el interés público y el interés del vecindario en particular sobre el interés del dueño del terreno que la solicita. Quevedo Segarra v. J.A.C.L., ante. Por vía de "excepciones", y en armonía con los propósitos generales del Reglamento antes mencionado, se le permite a A.R.P.E. autorizar ciertos usos que en el mismo se dispongan, siempre que por medio del diseño, construcción y operación del proyecto permitido, se haya de proteger la seguridad, el bienestar de los ocupantes de las propiedades limítrofes y, en fin, se asegure la debida protección al interés público.

En el presente caso, A.R.P.E., como resultado de la querella instada por la Asociación ante dicha agencia, entendió prudente concederle al Banco demandado una "excepción" al uso reglamentario dispuesto para los solares en cuestión, permitiendo así su utilización como estacionamiento. Es preciso destacar que no obra en el expediente de autos documento alguno referente a los factores considerados por dicho organismo al conceder tal permiso discrecional. De todas formas, el foro primario sostuvo que ambos solares podían ser utilizados como estacionamiento a la luz de ciertas disposiciones del referido Reglamento de Zonificación.

A tales efectos, el Reglamento[22] vigente al momento de autorizarse la excepción, disponía que en los Distritos Residenciales, incluidos obviamente los R-3 [23], se podrá permitir el establecimiento de áreas de estacionamiento como negocio o para servir un uso comercial, para vehículos de capacidad clasificada de no más de una y media (1.5) toneladas, en solares o predios abiertos que estén a una distancia no mayor de cien (100) metros de una Distrito C-2, entre otros distritos de clasificación comercial. Subsección 84.01(2) del Reglamento. A renglón seguido, disponía la referida subsección que los accesos desde y hacia las vías públicas para las áreas de estacionamiento en distritos residenciales, serán a través de los predios comerciales colindantes, en la medida en que sea posible, evitando la circulación de vehículos por calles que den frente a distritos residenciales. Más adelante, se dice que cuando no sea posible evitar la circulación de vehículos

---

[22] Ya anteriormente señalamos que el referido Reglamento fue derogado por el Reglamento de Zonificación de 5 de noviembre de 2000. Las secciones referentes a los usos permitidos en distritos R-3, y a la concesión de permisos para construcción de estacionamiento no han sufrido mayores cambios.

[23] Es preciso indicar que el Reglamento del 1992, Subsección 13.02, disponía que en los distritos R-3 se usarán los edificios o pertenencias para los fines expuestos a continuación: 1.) casas de una o dos familias; 2.) casas en hilera y casa de patio de acuerdo con lo establecido en las Secciones 74.00 y 75.00 de este Reglamento; 3.) casas de apartamientos, de acuerdo con lo establecido en la Sección 76.00 de este Reglamento y; 4.) otros usos de acuerdo con lo establecido en la Sección 99.00 de este Reglamento.

Hoy día, el Reglamento vigente desde el 5 de noviembre de 2000, dispone, entre otros usos, se permitirá como uso en Distritos R-3 estacionamientos en solares o estructuras construidas para esos propósitos, siempre que se cumpla con lo establecido para el diseño de áreas de estacionamiento en la Subsección 74.02 de este Reglamento. Subsección 13.02.

a través de calles en distritos residenciales se celebrará vista pública para considerar la forma de mitigar los efectos.

Con estos pronunciamientos en mente, procedemos a evaluar los argumentos presentados por el Banco demandado. Dicha parte alega que, por razón de que la citada subsección del Reglamento de Zonificación permite el establecimiento de áreas de estacionamiento en predios clasificados como residenciales, R-3, y en vista del hecho de que A.R.P.E. le concedió permisos de uso, de construcción y una eventual "excepción" al uso reglamentario para poder operar el estacionamiento, está en todo derecho de poder seguir operándolo como tal. Ello a pesar de que las restricciones de índole privada impuestas por escritura e inscritas en el Registro de la Propiedad vedan tal utilización.

En el pasado, al resolver controversias de similar naturaleza, hemos advertido enfáticamente que, aunque en ocasiones las servidumbres son compatibles con la zonificación del estado, su propósito, creación, e implantación dependerá de que los dueños de los solares o predios gravados las hagan valer. Reiteradamente hemos resuelto que la mera concesión de un permiso por la Junta de Planificación o por A.R.P.E. no tiene el efecto ni el alcance de anular restricciones privadas que resulten inconsistentes con el permiso concedido. Véase: Rodríguez v. Twin Towers, 102 D.P.R. 355, 356 (1974); Colón v. San Patricio Corp., ante, págs. 267; Pérez v. Pagán, 79 D.P.R. 195, 198 (1956); Sands v. Ext. Sagrado Corazón, ante, a la pág. 831.

Del mismo modo, una "rezonificación concedida no tiene el efecto de anular las restricciones privadas que resulten incompatibles con la misma." Luan Investment v. Román, 125 D.P.R. 533 (1990). En tales casos, los beneficiarios de la restricción, con el propósito de hacer valer sus derechos, pueden recurrir a una acción independiente, incluida la del *injunction* ordinario, para que los reclamos de todas las partes acreedoras al derechos surgido de la servidumbre en equidad, sean adecuadamente atendidos. Id. Véase: Olmeda Nazario v. Sueiro, ante.

Aun cuando la decisión del organismo administrativo recibirá la debida deferencia, en el balance de intereses y factores involucrados para la determinación de cuál reglamentación debe prevalecer, entiéndase la del Estado o la privada, tienen gran peso si el propietario que pretende utilizar su predio para fines vedados por la restricción privada, tenía o no conocimiento de las limitaciones por ésta impuesta. De tener el propietario conocimiento de tales limitaciones, bajo tales condiciones le está vedado el solicitar, y de que se le conceda, un alivio administrativo vía variaciones o excepciones. Véase: Asoc. C.D. Octubre v. J.A.C.L., ante, según citado en Asoc. Vecinos Park Side v. Junta, ante.

Ello así, por cuanto se supone que, al comprar la propiedad, éste adquirió conocimiento de las limitaciones a las que estaba sujeta la misma; luego no debe premiársele permitiendo la utilice para fines que den al traste con las

mismas. La persona que así actúe ciertamente se coloca voluntariamente en tal posición, "autoinfligiéndose" el perjuicio que le cause el  no poder utilizar su propiedad para los fines pretendidos. <u>Asoc. C.D. Octubre v. J.A.C.L.</u>, ante, a la pág. 334.[24]

No debe haber duda alguna de que, en el presente caso, cuando el Banco demandado adquirió la propiedad en cuestión, tenía conocimiento, o al menos lo obtuvo en ese momento, de que ambos predios se encontraban localizados en una zona residencial, colindante a un sector comercial, además de estar sujetos a las referidas restricciones. Al adquirir el terreno, obtuvo conocimiento además de que no podía construir allí ningún tipo de edificación, estructura y/o lote comercial, o no residencial, sin variar o sin que se le concediese una excepción al uso de dicho solar. Al conocer estas limitaciones, se colocó voluntariamente en una posición que eventualmente podría causarle un perjuicio; ciertamente, pretender obviar las restricciones privadas, a través de una variación o excepción, en este tipo de circunstancias, resulta totalmente improcedente. <u>Asoc. C.D. Octubre v. J.A.C.L.</u>, ante. Valga aclarar que la referida doctrina de la "autoinflicción del daño" aplica independientemente de que el perjudicado supiera que la restricción sobre la propiedad fuese real o

---

[24] Haciendo referencia además a, R.M. Anderson, *American Law of Zoning,* 2da. Ed., New York, Lawyer's Cooperative Pub. Co., 1976, Vol. III, Secs. 18.42, 18.43; D.G. Hagman, *Urban Planning and Land Development Control Law,* St. Paul, Minn., West Pub. Co., 1975, pág. 204.

constructiva. Fuertes, Guillermety v. A.R.P.E., 130 D.P.R. 971 (1992).

Como tribunal de justicia, tenemos el deber y la obligación de facilitar, en todo lo posible, dentro de la ley, que tanto el Estado como las personas particulares puedan hacer efectivas las disposiciones civilizadoras de urbanismo. Olmeda v. Nazario Sueiro, ante. No podemos ignorar, sin embargo que, en el presente caso el Banco supo de ello en todo momento, fue debidamente notificado y aún así solicitó y llevó a cabo todo un trámite de permisos en las agencias administrativas correspondientes. Al así actuar hizo caso omiso de la existencia de unas restricciones, primeras en tiempo, y pretendió utilizar la referida concesión administrativa como subterfugio para burlarlas.[25]

La aprobación de uso del estacionamiento por parte de A.R.P.E. no derogó en modo alguno las condiciones restrictivas. Como indicáramos en cuanto a tal aspecto en Colón v. San Patricio Corp., ante, págs. 267-68:

> "El hecho de que la Junta de Planificación haya aprobado la construcción de la urbanización a que se alude en la demanda, no tiene el efecto de anular las restricciones privadas que pueden impedir su construcción. Conforme dijimos en Pérez v. Pagán, 79 D.P.R. 195 (1956). Nada hay en la Ley de Planificación, 23 LPRA, secs. 1-54, ni en los

---

[25] Cabe destacar, según reseñan Arraiza Navas y Roqué Velázquez, que a través de toda la jurisprudencia en los casos citados previamente de Ginéz, Lawton, Macatee, se sostuvo la existencia y validez de la servidumbre en equidad impugnada y se procedió incluso a ordenar la demolición de la obra construida en contra de las restricciones previamente impuestas y que surgían del Registro de la Propiedad. Fermín L. Arraiza Navas y José R. Roqué Velázquez, *Las servidumbres en equidad, las defensas en equidad y el Registro de la Propiedad en el Derecho Puertorriqueño*, ante, a la pág. 41.

reglamentos aprobados por la Junta a virtud de esa Ley, que indique que la mera concesión de un permiso de construcción tenga el efecto y alcance de anular restricciones privadas que resulten inconsistentes con el permiso concedido. El otorgar un permiso de construcción es un deber ministerial, cuando la solicitud que al efecto se presenta cumple estrictamente con los requisitos de ley o de los reglamentos al efecto aprobados. <u>La situación que surge es análoga a cuando un reglamento de zonificación permite para un distrito un uso que está prohibido por restricciones convencionales.</u> Existe copiosa jurisprudencia al efecto de que en tales casos prevalecen las restricciones." (Citas omitidas en el original y énfasis suplido.)

Hemos resuelto, además, en cuanto a las autorizaciones emitidas por A.R.P.E., que aún cuando ésta hubiese permitido el establecimiento de cierto local comercial en una zona residencial, la obtención del referido permiso por parte de dicha agencia <u>no</u> tiene el efecto de anular restricciones inconsistentes con tal permiso.[26] Por consiguiente y según expresáramos anteriormente, <u>las servidumbres en equidad no pierden vigencia ante la autorización de una orden o permiso de A.R.P.E. o de la Junta de Planificación.</u>

En mérito de lo anteriormente expuesto, resolvemos que los permisos otorgados por A.R.P.E. para el uso y construcción del estacionamiento en cuestión así como la concesión de la "excepción" al uso reglamentario concedida a favor del Banco por dicha agencia, <u>no</u> tuvieron el efecto de anular las condiciones restrictivas en controversia en el presente caso.

Por los fundamentos antes expresados procede decretar la revocación de la sentencia emitida en el presente caso por el

---

[26] Véase: <u>Sabater v. Corp. Des. Econ.</u>, ante; citando a <u>Rodríguez v. Twin Towers Corp.</u>, ante; <u>Sands v. Ext. Sagrado Corazón</u>, ante; <u>Pérez v. Pagán</u>, ante, entre otros.

Tribunal de Circuito de Apelaciones. En consecuencia se declara con lugar la petición de interdicto permanente radicada por la parte demandante, ordenándose al Banco Santander que cese y desista de seguir utilizando los solares número 179 y 181 como un estacionamiento para sus clientes u otra personas, debiendo dicha institución financiera, además, tomar los pasos necesarios para evitar el uso como estacionamiento de dicho terreno por cualquier otra persona.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LOPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asoc. Pro Bienestar Vecinos
Urbanización Juan B. Huyke
Inc., et. al.

    Peticionarios

        vs.                 CC-2001-147     CERTIORARI

Banco Santander de Puerto Rico

    Recurridos

SENTENCIA

San Juan, Puerto Rico, a 28 de junio de 2002

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida en el presente caso por el Tribunal de Circuito de Apelaciones. En consecuencia se declara con lugar la petición de interdicto permanente radicada por la parte demandante, ordenándose al Banco Santander que cese y desista de seguir utilizando los solares número 179 y 181 como un estacionamiento para sus clientes u otra personas, debiendo dicha institución financiera, además, tomar los pasos necesarios para evitar el uso como estacionamiento de dicho terreno por cualquier otra persona.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre en el resultado sin opinión escrita. Los Jueces Asociados señor Fuster Berlingeri y señor Corrada del Río no intervinieron.

Patricia Otón Olivieri
Secretaria del tribunal Supremo