GEORGE SANDS Y OTROS, demandantes y recurridos, *v.* EXTENSIÓN SAGRADO CORAZÓN, INC., ET AL., demandadas y recurrentes.

*Número:* R-71-262        *Resuelto:* 13 de mayo de 1975

*Luis M. Román* y *Luis Negrón García,* abogados de las recurrentes.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

La demandada recurrente, Extensión Sagrado Corazón, Inc., a quien llamaremos de aquí en adelante la Constructora, compró en el año 1964 dos predios adyacentes de terreno de aproximadamente cinco cuerdas cada uno. Mediante escritura pública de 16 de agosto de 1965 dicha corporación estableció sobre ambos predios unas condiciones restrictivas por razón de que se proponía construir en ese terreno una urbanización residencial. Construyó la primera parte del proyecto, el cual llamó Reparto Villa Olga y el cual comprende 17 residencias con sus propios solares individuales. Estas se vendieron a distintos compradores.

Como se sabe, las condiciones restrictivas en urbanizaciones residenciales tienen el propósito de preservar la belleza, la comodidad y la seguridad del reparto residencial según éste es concebido por sus arquitectos y constructores. Estas condiciones restrictivas—las cuales limitan las facultades de los futuros adquirentes de los solares y de las viviendas en cuanto a hacer obras nuevas y efectuar cambios en las ya hechas[1]—hacen más bella, más apacible, más agradable y más segura el área residencial para las familias que allí vendrán a vivir.

En el caso de autos las condiciones restrictivas son de la naturaleza antes dicha. Así por ejemplo, prohíben fabricar más de una residencia en cada solar; éstas no deben exceder de dos pisos; hay restricciones sobre las cercas a construirse, sobre el ancho mínimo de las casas; no se permitirán estableci-

---

[1] En adición a las limitaciones que las leyes y reglamentos de zonificación y urbanismo disponen.

mientos comerciales; se prohíben los letreros y anuncios comerciales; se prohíbe echar basura en los solares no edificados, etc.

El plano final para el desarrollo de ambas parcelas fue sometido por la Constructora a la Junta de Planificación. La Junta aprobó la construcción de las 17 casas del Reparto Olga, pero mediante su Resolución de 7 de octubre de 1965 impuso ciertas condiciones para la aprobación de la extensión del Reparto. Las condiciones exigidas por la Junta las hizo necesarias la existencia de un talud en el predio donde se proyectaba construir la extensión del Reparto, cuyo talud excedía la inclinación permitida por las normas de seguridad de la Junta. La Junta requirió que se redujese la inclinación del talud; que se utilizasen medias cañas para recoger las aguas pluviales que bajasen del talud; que se garantizase la conservación de dichas medias cañas por espacio de un año; que la descarga de agua de las mismas no afectase los predios inmediatos; que los compradores de solares contiguos al talud fuesen informados de esas condiciones y que se sembrase grama en el talud.

La Constructora no pudo cumplir con esas condiciones o estimó que cumplir con las mismas no era económico y, al no hacerlo, la Junta no aprobó la lotificación y construcción de la extensión del Reparto. La Constructora decidió buscar otro uso para el terreno. Aparentemente la Constructora trató con la Corporación de Renovación Urbana y Vivienda (CRUV) la construcción de un complejo de 17 edificios con 194 apartamentos en el predio en cuestión. El proyecto habría de ser construido por Trigo Construction and Development Corporation, la otra codemandada recurrente, representada ésta por el Sr. Luis C. Trigo, quien es o era para aquella fecha, también Presidente de la Constructora.

La CRUV habría de comprar el proyecto una vez construido éste, mediante un contrato denominado "Turnkey Project Contract," mediante el cual una agencia del gobierno

federal que atiende estos asuntos aportaría fondos a la CRUV para ésta adquirir el proyecto. El proyecto siguió el siguiente curso. A principios de 1968, la CRUV solicitó de la Junta de Planificación de Puerto Rico autorización para la compra del proyecto, el cual fue denominado "Los Laureles." La Junta autorizó la compra y el desarrollo preliminar del proyecto. En 12 de diciembre del mismo año la CRUV y la oficina federal firmaron un documento denominado "Letter of Intent to Enter into Contract" el cual indicaba que el proyecto cualificaba para recibir financiamiento federal y que se habían reservado fondos para su compra. En mayo de 1969 la Junta aprobó los planos del proyecto. En 20 de junio de ese año la CRUV y Trigo Construction and Development Corp. firmaron el contrato de compraventa del proyecto, mediante el cual la CRUV le compraba a Trigo Construction dicho proyecto por $2,857,550.

Los demandantes recurridos son propietarios y residentes del Reparto Olga. No conformes con que contiguo a sus residencias se construyesen los mencionados edificios multipisos, los demandantes solicitaron de la Junta de Apelaciones sobre Construcciones y Lotificaciones que revisara dicha aprobación otorgada por la Junta de Planificación para la construcción de los edificios. La Junta de Planificación se opuso a que su decisión fuese revisada por la Junta de Apelaciones. Alegó que ésta carecía de jurisdicción por tratarse de un proyecto de obra pública. Así lo entendió también la Junta de Apelaciones y se declaró sin jurisdicción en 20 de enero de 1970.

Dos días después, en 22 de enero de 1970, los demandantes recurridos presentaron una demanda de *injunction* contra las demandadas recurrentes solicitando se ordenase la paralización de la construcción del proyecto, el cual había comenzado a construirse. En dicha acción los demandantes se basaron en que el proyecto de edificios multipisos violaba las condiciones restrictivas que para esa propiedad se habían dispuesto en la antes mencionada Escritura Núm. 86 de 16 de agosto de

1965. Año y medio después, en 6 de agosto de 1971, cuando el proyecto ya había sido construido, el Tribunal Superior emitió sentencia declarando con lugar la demanda y ordenó a las demandadas a restituir la situación que existía antes de producirse las violaciones a las condiciones restrictivas. Esto es, ordenó la destrucción de los 17 edificios, con sus 194 apartamentos, los cuales tenemos que asumir que están ocupados por el mismo número de familias.

En su Petición de Revisión las codemandadas hicieron nueve señalamientos de error, pero en su alegato abandonaron cuatro y discutieron solamente cinco. En síntesis, su posición es la siguiente: (1) las condiciones restrictivas no tienen validez legal; (2) los demandantes no agotaron los remedios administrativos; (3) dichas condiciones tienen que ceder ante la zonificación hecha por la Junta de Planificación; (4) que procede la defensa de incuria; y (5) que la sentencia es onerosa.

■ Estamos convencidos de que las codemandadas violaron las condiciones restrictivas que una de ellas, la Extensión Sagrado Corazón, Inc., estableció mediante documento público sobre el terreno en cuestión. Tampoco hay duda de que las codemandadas tenían conocimiento de dichas condiciones. Las condiciones restrictivas son absolutamente válidas. Ya antes hemos sostenido la validez en derecho de los contratos que imponen condiciones restrictivas a predios que se urbanizan. *Glines* v. *Matta*, 19 D.P.R. 409 (1913); *Lawton* v. *Rodríguez Rivera*, 35 D.P.R. 487 (1926); *Baldrich* v. *Registrador*, 77 D.P.R. 739 (1954). En este último caso, a la pág. 745, expresamos que dichas condiciones son derechos reales. Los demandantes acudieron a la Junta de Apelaciones sobre Construcciones y Lotificaciones y, como hemos visto, a los dos días de su fallo recurrieron al Tribunal Superior. Los demandantes no venían obligados a agotar más remedios administrativos pues la querella administrativa se basaba en violaciones a los reglamentos de zonificación, mientras que la causa ante nos

se basa en la violación de las condiciones restrictivas. No se cometieron los errores primero, segundo y cuarto. Tampoco se cometió el tercero por razón de que la Junta de Planificación no hizo formalmente ninguna rezonificación del área ni celebró vistas públicas para oír a los vecinos de la misma. Lo que la Junta hizo fue aprobar unos planos y, como veremos más adelante, esto no anuló las condiciones restrictivas.

En cuanto al quinto señalamiento, si bien es cierto que la orden del tribunal es onerosa, también es cierto que las codemandadas crearon a sabiendas la situación que la provocó. Por motivo de lucro violaron las condiciones que habían establecido para hacer la urbanización más atractiva, más vendible y más valiosa.

■ Las condiciones restrictivas que nos ocupan se denominan *"equitable servitudes"* en el derecho anglosajón. Aunque intrínsecamente no tienen nada de equidad, se les llamó así en aquel derecho debido a que por motivo de la rigidez del antiguo derecho común anglosajón hubo que recurrir judicialmente a la *equity* para proveerle cauces jurídicos a estos derechos reales. (²) En nuestro derecho no tenemos ese problema. Se trata de derechos reales, lo cual cae cómodamente dentro de nuestro Derecho Civil. En el contrato de compraventa de un solar afectado por condiciones restrictivas éstas son parte del contrato; así vende quien vende y así compra quien compra.

■ En cuanto a las cuestiones que habíamos dejado pendientes, la primera consiste en si no pueden invocarse las condiciones restrictivas por el hecho de que se trata de obra pública. En el caso de autos la Junta de Planificación aprobó el proyecto para los edificios multipisos. Esa aprobación no derogó las condiciones restrictivas. Como dijimos en *Colón* v. *San Patricio Corporation*, 81 D.P.R. 242 (1959), a las págs. 267–268:

---

(²) Burby, *Real Property* (1943), pág. 134; Holdsworth, *A History of English Law*, 5ta. ed. (1966), Vol. III, pág. 158.

832

"El hecho de que la Junta de Planificación haya aprobado la construcción de la urbanización a que se alude en la demanda, no tiene el efecto de anular las restricciones privadas que pueden impedir su construcción. Conforme dijimos en *Pérez* v. *Pagán*, 79 D.P.R. 195: 'Nada hay en la Ley de Planificación, 23 L.P.R.A., secs. 1–54, ni en los reglamentos aprobados por la Junta a virtud de esa Ley, que indique que la mera concesión de un permiso de construcción tenga el efecto y alcance de anular restricciones privadas que resulten inconsistentes con el permiso concedido. El otorgar un permiso de construcción es un deber ministerial, cuando la solicitud que al efecto se presenta cumple estrictamente con los requisitos de ley o de los reglamentos al efecto aprobados. La situación que surge es análoga a cuando un reglamento de zonificación permite para un distrito un uso que está prohibido por restricciones convencionales. Existe copiosa jurisprudencia al efecto de que en tales casos prevalecen las restricciones.' " (Citas omitidas.) ([3])

Esto es así porque debido a la naturaleza beneficiosa que dichas condiciones tienen para las áreas residenciales, dichas condiciones pactadas en la escritura son parte del valor que compra el adquirente de la residencia y por el cual paga. Al así hacerlo tiene la justificada expectación de que dichas condiciones van a ser respetadas por todos y, de más está decirlo, especialmente por el vendedor que las impuso.

■ Al violar dichas condiciones o al destruirlas, ya sea por partes privadas o por el gobierno, se está tomando propiedad sin justa compensación y se están violando los contratos. Como se sabe, excepto que una ley especial expresamente lo permita, las partes privadas no pueden expropiar bienes y derechos. Las partes privadas compran bienes y derechos y si en vez de comprarlos los perjudican, vienen obligados a pagar

---

([3]) En adición a los casos citados en *Pérez* v. *Pagán*, supra, a la pág. 198, *in fine*, y 199, pueden verse los siguientes: *Chuba* v. *Glasgow*, 299 P.2d 774 (1956); *Ludgate* v. *Sommerville*, 256 P. 1043 (1927); *Farmer* v. *Thompson*, 289 S.W.2d 351 (1956); *Burgess* v. *Magarian*, 243 N.W. 356 (1932); *Jenny* v. *Hynes*, 184 N.E. 444 (1933); *Sorrentino* v. *Cunningham*, 39 N.E.2d 473 (1942).

daños a tenor con el Art. 1802 del Código Civil. El gobierno puede expropiar bienes y derechos, pero al hacerlo viene obligado a pagar justa compensación. Constitución, Art. II, Sec. 9. No es el nuestro un estado policíaco en donde el gobierno toma lo que necesita sin obligación de pagar nada. Desde luego, cuando hay interés público envuelto ello ha de tomarse en cuenta y los tribunales le darán la consideración que amerite. Véase *E.L.A.* v. *Rodríguez,* 103 D.P.R. 636 (1975). Véase también Church, *The Effect of Private Restrictive Covenants on Exercise of the Public Powers of Zoning and Eminent Domain,* en 1963 Wis. L. Rev. 321, 326 y ss. (1963).

En cuanto al quinto señalamiento—el ser onerosa la sentencia recurrida—ya nos hemos expresado. El cuarto planteamiento, el cual le imputa incuria a los demandantes, no tiene mérito. De la propia relación de hechos que antes hicimos así se desprende. Los demandantes recurrieron a la Junta de Apelaciones sobre Construcciones y a los dos días de ésta declararse sin jurisdicción, los demandantes acudieron a los tribunales de justicia.

Normalmente cuando se construye en violación de las leyes y los reglamentos el mejor remedio es ordenar la destrucción de la construcción clandestina. Además de resolver en justicia el caso particular de que se trate, dicha destrucción sirve de ejemplo a violadores potenciales de las leyes de zonificación y urbanismo. Sin embargo, en el caso de autos, tomando en consideración la culpa de las codemandadas, los daños causados a los propietarios del Reparto Villa Olga, los intereses encontrados en cualquier solución al caso (194 familias, edificios públicos cuya sustitución por otros costaría 3 ó 4 veces lo que costaron cuando se hicieron) y haciendo ingrediente de la decisión la equidad en su sentido civilista, *modificaremos la sentencia recurrida en el sentido de condenar solidariamente a las codemandadas a pagar a cada uno de*

*los demandantes $15,000, más $10,000 para honorarios de abogado y las costas. Así modificada se confirmará.*

El Juez Asociado Señor Negrón García se inhibió.