Cordero, Juez Ponente
*705 TEXTO COMPLETO DE LA SENTENCIA
El 7 de marzo de 2003, el Montehiedra Community Association (en adelante, Montehiedra) presentó ante este Tribunal un recurso de Certiorari y nos solicitó la revisión de la Resolución emitida el 31 de enero de 2003, y notificada el 7 de febrero de 2003, por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, TPI) en el caso Montehiedra Community Association, Inc. v. Alberto Bolaños Pérez y otros.
A continuación, exponemos brevemente el trasfondo fáctico y procesal del caso.
I
La urbanización Montehiedra se encuentra sometida a ciertas condiciones restrictivas o servidumbres en equidad, según surge de la Escritura Número Veintitrés (23) de 30 de julio de 1992 titulada "Deed of Declaration of Covenants, Conditions and Restrictions for the Montehiedra Community" (en adelante, la Escritura). La misma se encuentra debidamente inscrita en el Registro de la Propiedad.
La parte recurrida, el Sr. Alberto Bolaños (en adelante, Bolaños) es titular de la residencia localizada en la Calle Bienteveo, número 91, de dicha urbanización. Los hechos que dieron lugar a este pleito datan del año 1997, cuando Montehiedra se percató de la existencia de unos árboles y plantas en el talud de la parte posterior de la residencia de Bolaños. Según Montehiedra, los mismos están en violación a las condiciones restrictivas establecidas en la Escritura y reglamentos de la referida urbanización. Además, alega que dichos árboles y plantas fueron sembrados sin cumplimentar la debida solicitud requerida por el Comité de Modificaciones (en adelante, el Comité), organismo creado por su Junta de Directores para velar por el cumplimiento de dichas restricciones.
Ante dicha situación, el 10 de febrero de 1997, Montehiedra procedió a enviarle una notificación a Bolaños, recomendándole la reubicación de las plantas y árboles sembrados en la parte alta del talud al área más baja de éste, de forma tal que éste pudiera mantener sus plantas y, a su vez, cumplir con el reglamento de la *706 urbanización. A tales efectos, le concedió quince (15) días a partir de la fecha de la notificación para que tomara acción correctiva sobre este asunto. 
Ante la inacción de Bolaños, el 22 de febrero de 2001, Montehiedra procedió a enviarle otra carta, indicándole que las plantas y árboles sembrados en el talud de la parte posterior de su residencia tenían que ser removidas en su totalidad. Para realizar dicha gestión, le concedió un plazo máximo de diez (10) días laborables. Además, lo apercibió que, de no cumplir con ese requerimiento en el tiempo especificado, el caso sería referido a su departamento legal. Posteriormente, Bolaños solicitó a Montehiedra la concesión de treinta (30) días para realizar la remoción de los árboles y plantas solicitada, lo cual le fue concedido.
No obstante, el 20 de abril de 2001, Montehiedra volvió a enviarle una carta a Bolaños en la que le indicó que habían transcurrido sesenta (60) sin que éste realizara la remoción de árboles y plantas solicitada. No empece a esto, le concedió hasta el 1 de mayo de 2001 para cumplir con dicha gestión. Así las cosas, el 2 de agosto de 2001, tal y como se le había advertido, los representantes legales de Montehiedra le enviaron una carta a Bolaños concediéndole un término de quince (15) días adicionales para remover toda vegetación sembrada en la parte posterior de su residencia. Lo apercibieron que de no cumplir con ese mandato, procederían a presentar una demanda en el TPI de San Juan. 
A pesar de todas estas advertencias y concesiones de términos adicionales para realizar la remoción de los árboles y plantas solicitada por Montehiedra, Bolaños no cumplió con la misma. Así, pues, el 18 de septiembre de 2001, Montehiedra procedió a presentar la demanda de interdicto en su contra. El 26 de octubre de 2001, Bolaños contestó la demanda.
Luego de varios incidentes procesales, el 23 de agosto de 2002, Montehiedra presentó Moción de Sentencia Sumaria, en la que alegó que, por no existir controversia sobre los hechos materiales del caso, procedía que el TPI emitiera sentencia sumaria a su favor. El 10 de septiembre de 2002, Bolaños presentó oposición a la solicitud de sentencia sumaria presentada, alegando que existían varios hechos en controversia, los cuales, a su entender, impedían que el TPI resolviera sumariamente el caso.
Así las cosas, el 31 de enero de 2003, notificada el 7 de febrero de 2003, el TPI emitió Sentencia, en la que denegó la solicitud de sentencia sumaria presentada por Montehiedra por entender que existía controversia sobre algunos hechos materiales del caso y por entender que el remedio solicitado por ésta requería especificidad. A tales efectos, señaló que, una vez Montehiedra presentara la demanda enmendada, procedería a celebrar la vista en su fondo. No conforme con esta determinación, el 24 de febrero de 2003, Montehiedra presentó ante el TPI una solicitud de reconsideración, la cual fue declarada No Ha Lugar el día 27 de ese mismo mes y año y notificada el 3 de marzo de 2003. En ésta, el TPI, además, incluyó una orden de señalamiento de la conferencia sobre estado de situación de los procedimientos para el 20 de marzo de 2003.
Inconforme con la Sentencia emitida por el TPI, Montehiedra recurre ante nos mediante recurso de Certiorari y alega que erró el TPI al declarar No Ha Lugar su solicitud de sentencia sumaria, por entender que existía controversia sobre algunos hechos materiales del caso y por carecer la demanda de especificidad, lo cual impedía la concesión de un remedio.
II
Las servidumbres en equidad son "cláusulas restrictivas 'a beneficio de los presentes y futuros adquirentes' que imponen cargas o gravámenes especiales, como parte de un plan general de mejoras para el desarrollo de una urbanización residencial en esa finca....". Asoc. Pro Bienestar Vecinos Urbanización Juan B. Huyke, Inc. v. Banco Santander de Puerto Rico, 157 D.P.R. _ (2002), 2002 J.T.S. 104, Opinión de 28 de junio de 2002, a la pág. 1461, citando a Colón v. San Patricio Corp., 81 D.P.R. 242, 250 (1959). Son cargas o gravámenes reales que, una vez inscritas en el Registro de la Propiedad, constituyen derechos reales oponibles erga omnes. Asoc. *707 Pro Bienestar Vecinos Urbanización Juan B. Huyke, Inc. v. Banco Santander de Puerto Rico, supra, a la pág. 1461; Asoc. V. Villa Caparra v. Iglesia Católica, 117 D.P.R. 346, 353 (1986).
"En términos jurídicos, la servidumbre en equidad es considerada un contrato entre las partes, ya sea porque éstas acuerdan gravar sus propiedades para delimitar su uso o el tipo de edificación que se puede efectuar sobre éstas o porque adquirentes posteriores de la propiedad gravada, conociendo las restricciones inscritas en el Registro de la Propiedad, aceptan someterse a éstas." Residentes Parkville Sur, Residentes Parkville Norte y Otros v. Margarita Díaz Luciano y Otros, 159 D.P.R._, 2003 J.T.S. 73, a la pág. 957.
Normalmente, esas condiciones restrictivas son constituidas unilateralmente por el urbanizador y limitan las facultades de los futuros adquirentes, con el propósito de “preservar la belleza, la comodidad y la seguridad del reparto residencial”, según éste es concebido por sus arquitectos y constructores. Sabater v. Corporación de Desarrollo Económico, 140 D.P.R. 497, 506 (1997); Asoc. V. Villa Caparra v. Iglesia Católica, supra, a la pág. 351; Sands v. Ext. Sagrado Corazón, Inc. 103 D.P.R. 826, 827 (1975). Respecto al alcance de tales limitaciones, el Tribunal Supremo ha indicado que el criterio más importante es que, mediante el lenguaje utilizado, "se le informe debidamente y sin ambigüedades a los nuevos adquirentes y terceros, sobre lo que se les está o no está permitido realizar". Cond. S.J.H. Centre v. P.R.F., Inc., 133 D.P.R. 488, 504 (1993); Asoc. Pro Bienestar Vecinos Urbanización Juan B. Huyke, Inc. v. Banco Santander de Puerto Rico, supra, a la pág. 1463. "Lo realmente importante al interpretar las cláusulas restrictivas de la servidumbre en equidad es conocer cuál fue el verdadero fin que se perseguía al gravar las propiedades mediante la servidumbre en equidad." Residentes Parkville Sur, Residentes Parkville Norte y Otros v. Margarita Díaz Luciano y Otros, supra, a las págs. 957 y 958.
Para que las condiciones restrictivas se consideren válidas, ha indicado el Tribunal Supremo, se requiere que: (1) dichas limitaciones sean razonables, (2) se hayan establecido como parte de un plan general de mejoras, (3) consten de forma específica en el título, y (4) se inscriban en el Registro de la Propiedad. Residentes Parkville Sur, Residentes Parkville Norte y otros v. Margarita Díaz Luciano y otros, supra, a la pág. 956; Sabater v. Corporación de Desarrollo Económico, supra, a la pág. 506; Asoc. V. Villa Caparra v. Iglesia Católica, supra, a la pág. 352; Carrillo v. Camejo, 107 D.P.R. 132, 137 (1978); Sands v. Ext. Sagrado Corazón, Inc., supra, a la pág. 827; Lawton v. Rodríguez, 35 D.P.R. 487, 494 (1926). Una vez inscritas en el Registro de la Propiedad, se considera que las restricciones constituyen derechos reales oponibles erga omnes, lo que crea entre los predios afectados "una relación de servidumbres recíprocas, pues cada lote o solar es predio dominante, a la vez que sirviente, con relación a los demás lotes o solares de la urbanización". Residentes Parkville Sur, Residentes Parkville Norte y Otros v. Margarita Díaz Luciano y Otros, supra, a la pág. 957; Asoc. V. Villa Caparra v. Iglesia Católica, supra, a la pág. 353, citando a José R. Vélez Torres, Curso de Derecho Civil, San Juan, Ed. Art Printing, 1983, T.n, pág. 416; Carrillo v. Camejo, supra, a la pág. 136.
Debido a la naturaleza de derecho real inscribible de esta figura, se le imputa a todo presente y futuro adquirente de la propiedad que ésta grava, el conocimiento de las limitaciones y condiciones impuestas en virtud de la misma. El Tribunal Supremo ha expresado que, dado a su constitución unilateral por el urbanizador y la subsiguiente inscripción en el Registro de la Propiedad, ciertamente tales condiciones restringen y limitan las facultades de los futuros adquirentes. Asoc. Pro Bienestar Vecinos Urbanización Juan B. Huyke, Inc. v. Banco Santander de Puerto Rico, supra, a la pág. 1462.
De conformidad con ello, recientemente, el Tribunal Supremo resolvió que "cuando una persona tiene pleno conocimiento de las limitaciones de uso de una propiedad, nunca debe permitírsele llevar a cabo la conducta o actuación prohibida por tales restricciones. A esos efectos, establecimos o elaboramos la doctrina del daño auto infligido. (Citas omitidas). A medida que se obtenga conocimiento sobre el tipo de condición a la cual esté afecta la propiedad, toda clase de daño producto de alguna actuación en contravención a la misma, tendrá al actor como único causante de su perjuicio". Asoc. Pro Bienestar Vecinos Urbanización Juan B. *708 Huyke, Inc. v. Banco Santander de Puerto Rico, supra, a la pág. 1462.
Para hacer efectivos sus derechos e impedir el incumplimiento con las limitaciones impuestas, los dueños de las propiedades vecinas tienen disponible el recurso de injunction. Asoc. V. Villa Caparra v. Iglesia Católica, supra, a la pág. 354; Colón v. San Patricio Corp., supra, a la pág. 259. Para tener derecho a dicho remedio, si se trata de una reclamación por incumplimiento de condiciones restrictivas, no es necesario probar, de hecho, que se han sufrido daños o perjuicios sustanciales; basta demostrar la violación a la restricción. Pérez v. Pagan, 79 D.P.R. 195,199-200 (1956).
El demandado, por su parte, contra ese recurso de injunction, puede oponer todas las defensas tradicionales que otorga el derecho consuetudinario inglés, tales como: (1) el consentimiento (acquiescence); (2) la conciencia impura (unclean hands); (3) la incuria (laches), y (4) el impedimento (estoppel). Residentes Parkville Sur, Residentes Parkville Norte y Otros v. Margarita Díaz Luciano y Otros, supra, a la pág. 956; Asoc. v. Villa Caparra v. Iglesia Católica, supra, a la pág. 354.
Un demandado puede, además, alegar como defensa ante dicha acción de injunction que las servidumbres se han extinguido o modificado: (1) por acuerdo de los interesados; (2) por efecto del tiempo o por realizarse la condición si así se constituyeron; (3) por confusión; (4) por renuncia o abandono de los propietarios que reciben los beneficios de la servidumbre; (5) por expropiación forzosa si los gravámenes son incompatibles con el uso público del inmueble expropiado, y (6) "cuando cambios radicales del vecindario no sólo hacen la restricción irrazonable y opresiva para el dueño del predio sirviente, sino también destruyen el valor que la restricción tenía para el dueño del predio dominante, por lo cual resulta en verdad imposible alcanzar los fines que perseguía la servidumbre". Asoc. Pro Bienestar Vecinos Urbanización Juan B. Huyke, Inc. v. Banco Santander de Puerto Rico, supra, a la pág. 1462; Asoc. v. Villa Caparra v. Iglesia Católica, supra, a la pág. 354; Colón v. San Patricio Corp., supra, a las págs. 261-265.
Una vez reconocida la validez y vigencia de las cláusulas restrictivas de una servidumbre en equidad, los tribunales deben hacer cumplir a cabalidad los propósitos del acuerdo al que las partes han aceptado someterse al adquirir la propiedad gravada. Esta norma tiene como finalidad preservar la autonomía de la voluntad de las partes plasmada en las cláusulas restrictivas de la servidumbre en equidad. "Debido a ello, los tribunales no tienen facultad para soslayar dicha voluntad por criterios ajenos a ésta, salvo que sea contraria a la ley, a la moral o al orden público." Residentes Parkville Sur, Residentes Parkville Norte y Otros v. Margarita Díaz Luciano y Otros, supra, a la pág. 957; Colón v. San Patricio Corp., supra, a la pág. 266; Glines v. Matta, supra, a la pág. 417. Véase, además, Artículo 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3372.
Ill
Con ese trasfondo teórico de la figura, tal cual ha sido desarrollada en Puerto Rico, examinemos los hechos del caso ante nos y analicemos si, efectivamente, el TPI incurrió en el error alegado por Montehiedra en su escrito de Certiorari.
Los solares que hoy día componen la Urbanización Montehiedra fueron gravados con cláusulas restrictivas, las cuales constan en la Escritura Número Veintitrés (23) de 30 de julio de 1992, supra, debidamente inscrita en el Registro de la Propiedad. De hecho, de la Escritura surge claramente la obligación de cada titular de Montehiedra de que toda alteración o modificación realizada a las unidades de vivienda esté conforme a lo establecido en este documento. En cuanto a esto, la sección 7.2 de la Escritura establece que:
"Each owner shall maintain his or her Unit and all structures, parking areas and other improvements comprising the Unit in a manner consistent with the Community Standard and all applicable convenants....”. Sección 7.2 de la Escritura, pág. 37, a la pág. 89 del Apéndice. (Enfasis nuestro.)
*709 En relación a las alegadas violaciones incurridas por Bolaños, la Escritura establece la autoridad de la Junta de Directores de Montehiedra (en adelante, la Junta) para velar porque la siembra y remoción de árboles y plantas en las propiedades esté a tono con las guías pautadas en la Escritura. A tales efectos, la sección 11.2 de la Escritura dispone lo siguiente:
"No construction, which term shall include within its definition, staking, clearing, excavation, grading, and other site work, no exterior alteration or modification of existing improvements, and no planting or removal of plants, trees, or shrubs shall take place except in strict compliance with this Article and with section Thirteen Point Eleven (13.11) of this Declaration, until the requirements of each have been fully met, and until the approval of all appropriate governmental entities has been obtained." Art. XI de la Escritura, pág. 46, a la pág. 98 del Apéndice. (Enfasis nuestro.)
"REMOVAL OF TREES: In reviewing building plans, Declarant and the Modifications Committee shall take into account the natural landscaping, such as trees and shrubs, and encourage the Owner to incorporate them into the landscaping plan. No tree of four (4) or more inches in diameter shall be cut or removed without approval of Declarant or the Modifications Committee." Sección 13.11 de la Escritura, pág. 57, a la pág. 109 del Apéndice. (Enfasis nuestro.)
La Junta fue envestida con la autoridad para aplicar y velar por el cumplimiento de lo establecido en la Escritura, a través de la implantación de controles, parámetros y limitaciones. A su vez, para ayudar a la Junta a cumplir con dicho mandato, la sección 11.2 de la Escritura autorizó la creación de un Comité de Modificaciones (en adelante, el Comité), el cual tiene a su cargo establecer los mecanismos y guías a seguir por todos los titulares para lograr los objetivos que persiguen las restricciones impuestas. A tales efectos, este Comité utilizará como guía el Manual de Diseño (en adelante, el Manual), según lo establece la sección 11.1 de la Escritura. 

"...The Modifications Committee, if established, shall have exclusive jurisdiction over modifications, additions, or alterations made on or to existing Units or structures containing Units and the open space, if any, appurtenant thereto."

"The Modifications Committee shall promulgate, as part of the Design Review Manual, detailed standards, and procedures governing its areas of responsibility and practice, consistent with the Community Standard. In addition thereto, the following shall apply. Plans and specifications showing the nature, kind, shape, color, size, materials, and locations of any such modifications, additions, improvements or alterations, shall be submitted to the Modifications Committee for approval as to design with existing structures, location in relation to surrounding structures, topography, and finish grade elevation..." Art. XI, sección 11.2 de la Escritura, pág. 47, a la pág. 99 del Apéndice. (Enfasis nuestro.)
El referido Manual, por su parte, también incluye las siguientes disposiciones pertinentes a las alegadas violaciones incurridas por Bolaños:
"All requests for exterior alterations must be submitted to, and approved by, the MC before they may be undertaken." Sección I, pág. 2 del Manual, pág. 36 del Apéndice.
"Such improvements include without limitations, additions, modifications and alterations to homes..., patios, and patio covers, and any other alterations to the lot and yards." Sección III, página 3, del Manual, página 37 del Apéndice.
"The proposed alteration should relate favorably to the landscape, the existing structure, and the neighboring elevations. The Modification’s Committee’s primary concerns are access, view, sunlight, *710 ventilation and drainage. For example, fences may obstruct views, breezes or access to neighboring property; decks or larger additions may cast unwanted shadows on an adjacent patio or infringe on a neighbor’s privacy. "Key Architectural Guidelines" del Manual, pág. 8, a la pág. 142 del Apéndice. (Enfasis nuestro.)
De una lectura de esta cláusula, podemos concluir que dentro de las alteraciones a que hace referencia la misma, se encuentra todo aquello que interfiera con las luces y vista, el aire o el acceso a la propiedad vecina, incluyendo los árboles y plantas. Dicho Manual, es aún más específico al enumerar, en su sección XXIII (23), las plantas y/o árboles, cuya siembra es totalmente inaceptable en las residencias de Montehiedra. Los mismos son los siguientes:
“* Artificial grass or plant materials
* Noxious weeds
* Norfolk Island Pine
* Australian Pine
* Melaleuca
* Brazilian Pepper
* Bischofia Javanica
* Jamaican Tall Coconuts (subject to disease)”
(Enfasis nuestro.)
Del texto de las cláusulas restrictivas incluidas, tanto en la Escritura como en el Manual, se puede apreciar claramente que el esquema establecido en las mismas es uno detallado con procedimientos y características específicas para cada alteración o modificación que los titulares interesen realizar. Entendemos que dichas cláusulas informan debidamente y sin ambigüedades a los nuevos adquirentes y terceros sobre lo que se les está o no permitido realizar en las propiedades que adquieran en la urbanización Montehiedra, incluyendo los espacios abiertos de éstas. Asimismo, surge cuál fue el verdadero fin que se perseguía al gravar las propiedades mediante la servidumbre en equidad, a saber, asegurarle a los titulares que el criterio del diseño, las guías y procedimientos serán mantenidos, lo cual, a su vez, ayuda a proteger el valor de la propiedades y mejorar el ambiente de la comunidad de Montehiedra en general. 
Inclusive, el propio Manual indica que todas las peticiones para realizar alteraciones deberán ser sometidas a, y aprobadas por, el Comité antes de que las mismas sean llevadas a cabo. (Traducción nuestra.) En cuanto a la intención que persigue el requisito de aprobación previa, el mismo indica, en su sección III, lo siguiente:
"The purpose of design approvals is not to restrict individual creativity or personal preferences, but rather to assure a continuity in design. Prior to commencement of any new residential addition, alteration, or major landscape installation of any type, the homeowner must first file an application. Failure to obtain the approval of the Modification Committee constitutes a violation of the Declaration and may require modification or removal of any unauthorized work or improvements at the homeowner’s expense." (Enfasis nuestro.)
En resumen, un análisis de las citadas cláusulas restrictivas, nos llevan a concluir que la siembra de árboles *711 y plantas que Bolaños llevó a cabo en el patio trasero de su propiedad se encuentra entre las actividades prohibidas por Montehiedra, para cuya realización se requiere una aprobación previa por parte del Comité.
Según expresáramos en la parte II de este escrito, el Tribunal Supremo ha dicho que cuando una persona tiene pleno conocimiento de las limitaciones de uso de una propiedad, nunca debe permitírsele llevar a cabo la conducta o actuación prohibida por tales restricciones. De hecho, surge del expediente ante nos que Bolaños tenía conocimiento del procedimiento a seguir en este tipo de situaciones, ya que en ocasiones anteriores, había dado cumplimiento al mismo antes de realizar alguna alteración o construcción en su propiedad. 
En el caso de autos, Bolaños alega que fue autorizado por el desarrollador de la urbanización para la siembra de los árboles y plantas en su propiedad en el año 1993, cuando solicitó autorización para la construcción de una verja. No obstante, hemos leído las cartas enviadas al desarrollador para tales efectos y hemos encontrado que las mismas no hacen referencia alguna a la siembra de árboles o plantas; sólo se limita a mencionar la construcción de la verja. 
Por otro lado, anteriormente, hemos indicado que la Escritura, la cual recoge las cláusulas restrictivas de la urbanización Montehiedra, fue otorgada en el 1992 y se encuentra debidamente inscrita en el Registro de la Propiedad al folio 179vto. del tomo 466 de Río Piedras Sur, inscripción 4ta. Por lo que, aun si aceptáramos como cierta la alegación de Bolaños de que, junto con el permiso para construir la verja, solicitó permiso para la siembra de los árboles y plantas, la misma quedaría derrotada ante el hecho de que de las mencionadas cartas surge que dicho permiso fue solicitado en el 1993, por lo que, dada la inscripción de la Escritura, en este caso, se le imputa a Bolaños el conocimiento de las limitaciones y condiciones impuestas en virtud de la misma, desde antes que éste solicitara el alegado permiso para la siembra de los árboles y plantas.
Es menester aclarar que el récord está desprovisto de prueba que sostenga la afirmación de Bolaños de que el desarrollador le dio permiso para la siembra de los árboles y plantas. Inclusive, en su escrito de oposición a la sentencia sumaria, Bolaños no presentó, junto con su solicitud, documento alguno para probar esta alegación, o para demostrar que en la Escritura, la Asociación honrara el permiso concedido a éste por el desarrollador y, por lo tanto, se le eximiera del cumplimiento de las restricciones relacionadas con la siembra de árboles y plantas. La Regla 10 (B) de Evidencia dispone que "la obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia". Más aún, el Tribunal Supremo ha expresado que meras alegaciones o teorías no constituyen prueba. Asoc. Auténtica Empl. v. Municipio de Bayamón, 111 D.P.R. 527, 531 (1981). Inclusive, para derrotar una solicitud de sentencia sumaria, como regla general, la parte opositora debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente. En este caso, evidentemente, Bolaños no lo hizo.
En su Resolución, el TPI denegó la solicitud de sentencia sumaria presentada por Montehiedra bajo el fundamento de que en este caso está en controversia si el urbanizador autorizó a Bolaños a sembrar las plantas y árboles en la parte posterior de su propiedad. No estamos de acuerdo con esta determinación del TPI por los argumentos señalados en el párrafo anterior.
Además, indica el TPI que es necesario probar si la parte posterior de la parte demandada es un "restricted lot area". No coincidimos con esta determinación del TPI, ya que entendemos que, independientemente de si el solar de Bolaños es o no un "restricted lot area", la prohibición de la siembra de esos árboles y plantas en su propiedad, surgía claramente de la Escritura y del Manual. Estos documentos prohíben este tipo de actividad, independientemente del área donde se realice la misma. Inclusive, el propio Manual indica que, entre las áreas de responsabilidad del Comité, se encuentra la aprobación de modificaciones al exterior de la residencia, incluyendo verjas, siembra ornamental y patios, entre otros. 
Por otro lado, el Manual también establece que toda alteración (incluyendo las siembras) que un titular *712 realice en su propiedad debe guardar una relación favorable con la topografía, estructuras existentes y elevaciones cercanas, tomando en consideración las preocupaciones principales del Comité, las cuales son el acceso, luces y vista, la ventilación y el drenaje de las propiedades. (Traducción nuestra.) En este caso, surge de las fotos incluidas en el expediente que los árboles en la propiedad de Bolaños sobrepasan la altura de la residencia vecina, lo cual claramente está en violación con dicha cláusula.
Tampoco estamos de acuerdo con la determinación del TPI de que no surgen de la Escritura ni del Manual los criterios para determinar qué árboles o plantas deben ser removidas o podadas y que, por tanto, el remedio solicitado requiere especificidad. La Escritura, en su artículo XI, transcrito en la parte III de este escrito, establece, sin lugar a dudas, que no se permite la siembra o remoción de plantas, árboles o arbustos. (Traducción nuestra.) Este artículo no hace excepción de clase alguna; es una prohibición absoluta. Por otra parte, en las cartas enviadas a Bolaños por la Asociación, se le indica que en su propiedad tenía sembrados árboles de Melaleuca, el cual se encuentra entre los árboles que están totalmente prohibidos en las residencias de Montehiedra. Para los demás tipos de árboles y plantas, se requiere solicitar autorización al Comité, el cual luego de analizar la solicitud, determinará si otorga o no el permiso. Es menester señalar que Bolaños nunca refutó que en su residencia hubiera este tipo de árboles.
Así, pues, en vista de que Bolaños conocía, o debió haber conocido, por el Registro, que no podía sembrar dichos árboles y plantas en el patio de su propiedad y, no empece a esto, lo hizo, entendemos que solamente él es responsable por su propio acto, y, por tanto, dicha siembra no puede prevalecer. Por otro lado, entendemos que la conducta observada por Bolaños ha sido contumaz, por demás, en vista de que desde el año 1993 estuvo recibiendo correspondencia, en ese entonces de parte del desarrollador, indicándole sobre los procedimientos a seguir para la realización de alteraciones o mejoras en las residencias. Posteriormente, en el año 1997, la Asociación le informó sobre la restricción, en cuanto a la siembra de árboles y plantas en los taludes de las residencias, e inclusive le brindó la opción de reubicarlas en otra área. No empece a todas estas advertencias y concesiones de términos adicionales para cumplir con lo solicitado por Montehiedra, Bolaños nunca hizo uso de esta opción, ni mucho menos accedió a cumplimentar la solicitud de aprobación, para por lo menos cumplir con el trámite procesal mínimo requerido por la Junta.
A tales efectos, este Tribunal no tiene facultad para soslayar la voluntad plasmada por las partes en las cláusulas restrictivas de la servidumbre en equidad de la urbanización Montehiedra. Por lo tanto, concluimos que el TPI incurrió en el error alegado.
IV
Por los fundamentos antes expuestos, se expide el auto de Certiorari, procedemos a revocar la Resolución recurrida y, por consiguiente, se declara Con Lugar la solicitud de Sentencia Sumaria presentada por Montehiedra. Se ordena al Sr. Bolaños a remover toda planta, árbol y vegetación localizada en la parte posterior de su propiedad que se encuentre en violación a las cláusulas restrictivas de la Urbanización Montehiedra y que hayan sido objeto de señalamiento y alegación en la presente acción. De no cumplir con lo requerido, se autoriza a la Junta de Directores de Montehiedra a realizar dicha gestión, en su lugar, a costo del Sr. Bolaños. Se le impone, además, a Bolaños el pago de las costas y demás gastos incurridos en el presente litigio.
El Juez Rodríguez Muñiz disiente sin opinión escrita.
Lo acuerda y manda este Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
*713 ESCOLIOS 2004 DTA 8
1. Apéndice del recurso de Certiorari, página 185.
2. Id., a la página 186.
3. Id., a la página 187.
4. Id., a las páginas 188-189.
5. Artículo 11 de la Escritura, pág. 47, a la pág. 99 del Apéndice del recurso de Certiorari.

6. Idem.

7. Refiérase a la pág. 42 del Manual, pág. 176 del Apéndice del recurso de Certiorari.
8. Refiérase a la pág. 3 del Manual, pág. 137 del Apéndice del recurso de Certiorari.
9. Refiérase a la pág. 2 del Manual, pág. 136 del Apéndice del recurso de Certiorari.
10. Idem.
11. Véase a esos efectos, cartas del 22 y 23 de noviembre de 1993 y carta del 15 de abril de 1993 a las páginas 191-193 del Apéndice del recurso de Certiorari.
12. Idem.
13. Según surge del Informe de Investigación, a la página 192 del Apéndice del recurso de Certiorari.
14. 32 L.P.R.A. Ap. IV, R. 10.
15. Regla 36.5 de las de Procedimiento Civil, 32 LPRA Ap. III, R. 36.
16. Refiérase a la sección II del Manual, pág. 15, a la pág. 149 del Apéndice del recurso de Certiorari.
17. "Key Architectural Guidelines" del Manual, pág. 8, a la pág. 142 del Apéndice.
18. Refiérase a la pág. 184 del Apéndice del recurso de Certiorari.
19. Véase a esos efectos, cartas del 22 y 23 de noviembre de 1993 y carta del 15 de abril de 1993, a las págs. 191-193 del Apéndice del recurso de Certiorari.
20. Véase a esos efectos, la sección XXIII del Manual, pág. 42 a la pág. 176 del Apéndice del recurso de Certiorari y la nota al calce número 7 de este escrito, supra.