La Jueza Asociada Señora Fiol Matta
emitió la opinión del Tribunal.
El caso ante la consideración de este Tribunal requiere que nos expresemos sobre la relación entre la Junta de Planificación y la Administración de Reglamentos y Permi-sos, y las facultades que la ley guarda para ambas agencias. Además, reiteramos la importancia de ceñirse a lo aprobado en la consulta de ubicación, para asegurar que los procesos administrativos de otorgamiento de permisos para -un proyecto de desarrollo realmente implanten la po-lítica pública adoptada por la Junta de Planificación.
I
El 28 de mayo de 1987, la Junta de Planificación (JP) recibió una consulta de ubicación que proponía un proyecto comercial en el municipio de Hatillo en un distrito de zoni-ficación R-l. Según el plano sometido a la JP, el centro comercial ocuparía un área superficial de sesenta mil pies cuadrados. Este proyecto proponía un “área rentable” de cincuenta mil quinientos pies cuadrados en un edificio principal, de los cuales veinte mil pies cuadrados se reser-varían para establecer un supermercado. Según el memorial explicativo, el resto del área se ocuparía con los nego-cios siguientes: “[t]ienda de zapato, joyería, tienda de telas, tienda de ropa de hombre, [b]outique y tienda de variedades”. Apéndice de la Petición de certiorari, pág. 201. Además, de los planos consta una estructura accesoria de dos mil quinientos pies cuadrados para la ubicación de un banco y dos estructuras adicionales de tres mil quinientos pies cuadrados, cada una para negocios de comida ligera. El 2 de septiembre de 1987, la JP emitió una resolución en la que permitió el uso de los terrenos según los parámetros de un distrito C-4, pero dejó en suspenso la aprobación del proyecto y sú consulta de ubicación, hasta tanto se le pre- *941 sentara un informe para mostrar la. viabilidad del pro-yecto, utilizando los criterios siguientes:
1. Un área de mercado más reducida, debido a que el pro-yecto es de carácter comunal y obviamente no va a tener el nivel de captación que ellos aíegan.
2. La viabilidad de los “fast foods” es necesario considerarla separadamente del análisis del centro comercial.
3. Una vez considerado lo anterior, deben incluirse las variables según se indican a continuación:
a. Población e ingreso del área de mercado en ambos análisis.
b. Costo por concepto de alimentos y de comidas ligeras de la clientela a servir (“fast foods” solamente).
c. Demanda actual y potencial (hasta 1990) en ambos análisis.
d. Oferta actual y futura de los negocios existentes y aprobados por la Junta de Planificación análogos a los inclui-dos en el proyecto en ambos análisis.
e. Determinación del déficit de oferta comercial en el área de mercado en ambos análisis.
4. En la determinación de la viabilidad económica de los “fast foods” será muy importante la consideración de la variable “flujo vehicular” para fines del análisis. (Enfasis nuestro.) Apéndice de la Petición de certiorari, págs. 197-198.
El Departamento de Comercio sometió posteriormente un informe en el que evaluaba la viabilidad del proyecto objeto de consulta. Su preocupación principal giraba en torno al área de mercadeo, ya que el proyecto era dema-siado extenso, y recomendó que éste se limitara a un total de 56,900 pies cuadrados. Según el resumen del informe recogido en la Resolución de la JP de 16 de junio de 1988, el endoso del proyecto, tal como se propuso, era contin-gente a la denegación de la consulta de otro centro comer-cial de tipo regional en Hatillo, consulta Núm. 87-05-1501-JPU, que supliría las necesidades de toda la región. Asimismo, el Departamento de Comercio recomendó que “se limite la construcción del proyecto objeto de consulta a 56,900 pies cuadrados [y que se distribuya el espacio en] facilidades comerciales vecinales ... traslado de negocios *942 [hasta] 19,000 pies cuadrados, negocios de comidas ligeras ... [y] espacio para oficinas”. Apéndice de la Petición de certiorari, pág. 190. Además, recalcó “que los 19,000 pies cuadrados se consideraran [sic] siempre y cuando se utili-cen para traslado de negocios operando en Hatillo”. Id.
Luego de celebrar una vista pública, la JP aprobó la Consulta de Ubicación Núm. 87-05-0898-JPU para el pro-yecto “La Ceiba Shopping Mall”. Según las determinacio-nes de hecho de la resolución, se describió con más detalles los tipos de negocios que ocuparían los locales del centro comercial. Particularmente se dispuso:
Los comercios a establecerse son la relocalización del Super-mercado Rosas con un área de 20,000 pies cuadrados, una tienda Pitusa de 10,000 pies cuadrados, un “laundry”, joyería, revelado de fotos, tienda de ropa de hombre, tienda de ropa de mujer, tienda de telas, tienda de zapatos de hombre y mujer, la Farmacia Dortas (relocalización) y oficinas. (Énfasis nuestro.) Apéndice de la Petición de certiorari, pág. 188.
La aprobación de la consulta de ubicación se acordó to-mando en consideración “las proyecciones poblacionales y ... la disponibilidad de los terrenos apropiados para la construcción ... en el área que comprende el proyecto pro-puesto ... [y la viabilidad del] desarrollo de los terrenos anteriormente descritos para el uso propuesto”. (Enfasis nuestro.) Apéndice de la Petición de certiorari, pág. 191. Además, dispuso que la construcción del centro de merca-deo debería estar en “real y efectiva construcción” dentro de treinta meses desde que se notificara la aprobación de la consulta. La resolución disponía que transcurrido este término, sin que el proyecto estuviera en real y efectiva construcción, cualquier solicitud de prórroga se tenía que presentar ante la JP para extender la vigencia de la consulta. La solicitud debía presentarse treinta días antes de la fecha de expiración de la última aprobación y señalar los motivos para la petición. Además, requeriría evidencia del progreso en la preparación de los documentos que se deben presentar para cumplir con la consulta aprobada.
*943 El 25 de abril de 1989, el promovente presentó, tardía-mente, un desarrollo preliminar para la consideración de la Administración de Reglamentos y Permisos (ARPe). Así, pues, el 26 de octubre de 1989, la JP emitió otra resolución reabriendo el caso y autorizando la consulta de ubicación según los mismos términos y condiciones, ya que la pri-mera quedó archivada al haber transcurrido los seis meses de su vigencia sin que la parte promovente presentara el desarrollo preliminar ante ARPe.(1) En la misma resolu-ción, la JP advirtió que “el proyecto deberá estar en real y efectiva construcción antes del 8 de febrero de 1991”. (Én-fasis nuestro.) Apéndice de la Petición de certiorari, pág. 184.
Así las cosas, el 18 de julio de 1991, ARPe autorizó el desarrollo preliminar del centro de comercial descrito a continuación:
De acuerdo a la información suministrada por la parte peti-cionaria, se propone la construcción de ... una [sic], el edificio principal, que incluye un supermercado con 30,000 pies cua-drados, un área comercial para variadas oficinas y comercios de 20,000 pies cuadrados; dos, un edificio para banco de 3,000 pies cuadrados; tres, un comercio “fast food” de 3,500 pies cua-drados y un cuarto edificio para “fast food” para un “Burger Kang” de 3,500 pies cuadrados; todo para un total de construc-ción de estructuras de 60,000 pies cuadrados. (Enfasis nuestro.) Apéndice de la Petición de certiorari, pág. 80.
Como parte de la resolución, se dispuso específicamente que “[s]e deberá cumplir con todo lo dispuesto por la Junta de Planificación de Puerto Rico, en su resolución de la Con-sulta de Ubicación Número 87-05-0898-JPU”. íd., pág. 81. Además, para su aprobación, dispuso que “[l]os usos a es-tablecerse en este proyecto estarán en conformidad con las *944 disposiciones del Reglamento de Zonificación, para un Dis-trito de Zonificación (C-4), según lo dispuesto en los seña-lamientos y recomendaciones establecidas por la Junta de Planificación de Puerto Rico en la consulta de referencia”. (Énfasis nuestro.) íd., pág. 84. El permiso tenía vigencia de un año, durante el cual se debían certificar los planos de construcción. De no hacerse así, el caso quedaría automá-ticamente archivado y se entendería desistido por el promovente.
Finalmente, el 2 de marzo de 1998, el promovente pre-sentó ante ARPe una “Solicitud de Permiso de Urbaniza-ción”, con el propósito de obtener un permiso de movi-miento de tierra para la construcción de las obras pluviales necesariás para canalizar escorrentías en un área de se-senta mil pies cuadrados del centro comercial. Ésta fue aprobada el 30 de marzo de 1998.
Posteriormente, ARPe recibió una solicitud para la aprobación de un desarrollo preliminar alterno, la cual concedió el 20 de marzo de 2000 a través del Permiso Núm. 00DL8-00000-00115. Según los planos y los datos recogidos en el Anejo I del permiso, además de la reubicación de los lotes comerciales, los cambios consistían en edificar 34,950 pies adicionales como parte del mismo proyecto. ARPe aprobó el permiso, pero dispuso en dicho anejo lo siguiente:
Se autoriza desarrollo preliminar alterno para rearreglo [sic] de ubicación de los edificios y facilidades del “Centro Comer-cial La Ceiba” manteniendo la capacidad y densidad comercial según autorizado por la Junta de Planificación. (Énfasis nuestro.) Apéndice de la Petición de certiorari, pág. 180.
También consta en dicho anejo que
... aunque en los planos se ubican edificios con cabida o área mayor a los 60,000 pies cuadrados autorizados por la Junta de Planificación, reconoce la parte promovente/proyectista que para lo adicional deberá obtener la correspondiente autoriza-ción enmendada por parte de la Junta de Planificación. Id.
*945 En el permiso de urbanización que ARPe otorgó el 30 de noviembre de 2000, se aclaró que el área de construcción de la edificación autorizada es de sesenta mil pies cuadrados. Este permiso se enmendó el 21 de octubre de 2003, sólo para que constara que el edificio que habría de construirse se denominaría “supermercado Amigo”. Asi-mismo se reiteró que “la cabida de construcción del ante-proyecto aprobado se mantiene según la aprobación original ... [y que el] proyecto del Supermercado futuro ... constará de 30,000 pies cuadrados de construcción”. Apén-dice de la Petición de certiorari, pág. 125.
Los peticionarios, Hatillo Cash & Carry y Pueblo International, LLC, solicitaron intervenir en los procesos administrativos. Por su parte, Walmart Puerto Rico, Inc. (Walmart) también solicitó una intervención. Todas las in-tervenciones se declararon “con lugar” y ARPe le notificó a los interventores mediante copia de la enmienda expedida el 21 de octubre de 2003. Ambos peticionarios solicitaron la reconsideración del permiso. Particularmente, Hatillo Cash & Carry alegó, entre otras cosas, que el permiso no procedía porque excedía los parámetros autorizados por la JP y porque ARPe había actuado al margen de las disposi-ciones establecidas por la JP en la Consulta de Ubicación. ARPe declaró “sin lugar” las mociones de reconsideración el 14 de enero de 2004. Dos días después, ARPe aprobó el permiso de construcción para el área del supermercado.
Inconforme con las determinaciones de ARPe, Hatillo Cash & Carry y Pueblo International, LLC presentaron sendos recursos de revisión ante el Tribunal de Apelaciones. Luego de varios incidentes procesales, el foro apelativo determinó que ARPe había actuado dentro de sus facultades otorgadas por ley. Los peticionarios recurrieron oportunamente ante nosotros de sus respectivas sentencias. El 29 de octubre de 2004 expedimos y consoli-damos ambos recursos de certiorari. Walmart presentó su alegato en noviembre de 2005 y ARPe compareció en cum-plimiento de orden en diciembre del mismo año. Con el *946 beneficio de la comparecencia de todas las partes, pasamos a resolver.
HH HH
La Ley Orgánica de la Junta de Planificación de Puerto Rico (Ley Orgánica de la JP) establece los propósitos generales por los cuales se creó la agencia. Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. see. 62 et seq.). Particularmente, el Art. 4 dispone que el propósito primordial de la JP es:
... guiar el desarrollo integral de Puerto Rico de modo coor-dinado, adecuado, económico, el cual, de acuerdo con las ac-tuales y futuras necesidades sociales y los recursos humanos, ambientales, físicos y económicos, hubiere de fomentar en la ' mejor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aque-lla eficiencia, economía y bienestar general social en el proceso de desarrollo en la distribución de la población, en el uso de las tierras y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la socie-dad pueda desarrollarse integralmente. 23 L.P.R.A. sec. 62c.(2)
Para que la JP pueda dedicar sus esfuerzos a las determinaciones de la política pública y a las estrategias del desarrollo físico, económico y social del país, la Legislatura delegó en ARPe. el velar por el cumplimiento de las leyes y los reglamentos y llevar a cabo los asuntos operacionales correspondientes. Asoc. Vec. Urb. Huyke v. Bco. Santander, 157 D.P.R. 521, 550 (2002); The Richards Group v. Junta de Planificación, 108 D.P.R. 23, 31-32 (1978).(3) Así pues, la Ley Orgánica de la Administración *947 de Recursos y Permisos define las facultades y funciones de la agencia. Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 et seq.) Destacamos particularmente el in-ciso (p) del Art. 5, que impone a ARPe el deber de
[a]plicar y velar el cumplimiento de sus propios reglamentos, de los Reglamentos de Planificación que haya adoptado o adopte la Junta de Planificación de Puerto Rico para el desa-rrollo, subdivisión y uso de terrenos y para la construcción y uso de edificios, así como el cumplimiento de toda ley estatal, ordenanza, o reglamentación de cualquier organismo gubernamental. 23 L.P.R.A. sec. 71d(p).
Asimismo, la Ley Orgánica de la JP permite delegar ciertos asuntos a ARPe, limitado exclusivamente a aquello que la misma ley dispone.(4) El Art. 11, en su inciso (19), permite, en lo pertinente:
(19) Delegar en la Administración de Reglamentos y Permi-sos deberes y responsabilidades que, en ley o de acuerdo a los Reglamentos de Planificación, se reservaron a la Junta en los siguientes casos ... o determinaciones en los que medien cua-lesquiera de las siguientes condiciones:
(i) que la estructuración o decisión a adoptarse no re-quiera implantar una política general o una definición de po-lítica pública, por haber sido éstas ya establecidas o adoptadas por la Junta;
*948 (ii) que la Junta determine, a la luz de la función de dicha Administración, que pueden resolverse los casos o adoptarse las determinaciones con más celeridad o eficiencia por la Ad-ministración. (Énfasis nuestro.) 23 L.P.R.A. sec. 62j.
Cada paso para lograr la aprobación de un proyecto de desarrollo ante estas agencias tiene su propósito particular. Es mediante estos procesos de planificación que la JP establece la política pública encomendada en su ley orgánica y ejerce sus facultades reglamentarias de zonificación y planificación de usos de terrenos. A.R.Pe. v. Rivera, 159 D.P.R. 429, 438 (2003); López v. Antonio Roig Sucrs., Inc., 157 D.P.R. 187 (2002); T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999). Según el Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, una consulta de ubicación es el procedimiento ante dicha agencia
... para que evalúe, y decide según estime pertinente, sobre propuestos usos de terrenos que no son permitidos ministe-rialmente por la reglamentación aplicable en áreas zonifica-das pero que las disposiciones reglamentarias proveen para que se consideren [o][e]n áreas no zonificadas. See. 2.00(7) del' Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 5244 del Departamento de. Estado, 27 de diciembre de 1994 (23 R.P.R. see. 650.225).
Con este mecanismo, la JP hace determinaciones de po-lítica pública mediante los procesos de adjudicación.(5) En *949 general, esta práctica administrativa la hemos reconocido desde Ruiz Hernández v. Mahiques, 120 D.P.R. 80, 85-86 (1987). En otras ocasiones hemos resuelto que, para regla-mentar a través de un proceso adjudicativo, la agencia debe emitir decisiones detalládas, razonadas y fundamen-tadas disponibles al público para que sirvan de guía y pue-dan ser revisadas por un tribunal para limitar la discreción de la agencia. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105, 138 (2002).
La evaluación de una consulta de ubicación es un proceso que debe integrar todos los elementos de planificación, incluyendo la viabilidad del proyecto propuesto, según se describe en la consulta de ubicación. El Reglamento Núm. 2433, aprobado como extensión enmendada a la Resolución JP-191 de 14 de junio de 1978, para interpretar y enmendar ciertas disposiciones del Reglamento Núm. 4 de Zonificación, establece la necesidad de evaluar y estudiar los factores siguientes al considerar una consulta de ubicación:
... las condiciones geográficas, las necesidades comerciales del área, la mejor utilización de los terrenos, las implicaciones del proyecto en los sistemas de transportación, los efectos sobre el crecimiento urbano, la conservación de los terrenos agrícolas, suministro de agua y energía eléctrica, facilidades portuarias, descarga de efluentes e impacto en el ambiente. Resolución Núm. 2433, supra, pág. 4.
La consulta de ubicación, una vez aprobada por la JP, también es un elemento esencial en la toma de decisiones de otras agencias. A esos efectos, la consulta es la descripción de un proyecto de desarrollo particular propuesto para un área específica, que provee el marco de referencia *950 en el cual las demás agendas deben medir la viabilidad del proyecto para la aprobación de sus respectivos permisos. T-JAC, Inc. v. Caguas Centrum Limited, supra, pág. 85.(6) Por esto es importante que los permisos posteriores se mantengan en el marco de lo aprobado por la JP en función de sus facultades para guiar la política pública en el orde-namiento territorial.
El Reglamento de Zonificación de Puerto Rico, o Reglamento de Planificación Núm. 4, autoriza los cam-bios en los mapas de zonificación a través de una consulta de ubicación. En particular dispone que “la parte interesada podrá iniciar el procedimiento de cambio en el mapa de zonificación sometiendo una copia del permiso de uso certificado y autorizado por la Administración de Reglamentos y Permisos como evidencia de que el mismo se construyó y se autorizó conforme a las disposiciones de la consulta”. See. 4.06(4) del Reglamento Núm. 6211 de 5 de noviembre de 2000 (23 R.P.R. see. 650.1650(6)). Así, una vez finalizado el proceso del otorgamiento de los permisos y construido el proyecto, la aprobación de la consulta conlleva cambios en los mapas de zonificación. Por eso, todos los elementos del proyecto propuesto, y su relación entre sí y su contorno, son considerados y ponderados por la JP antes de emitir su aprobación. De esta forma, los cambios significativos al proyecto, durante la etapa de solicitud de permisos ante ARPe, pueden alterar la integridad de la planificación que se procura a través del mecanismo de la consulta de ubicación. Por consiguiente, son cambios significativos aquellos que hubieran afectado la decisión original de la agencia, entre éstos, cambios en la extensión del *951 proyecto propuesto o de la parcela en la que se propone ubicarlo. Estos son factores importantes que la JP toma en cuenta al momento de evaluar toda consulta de ubicación. No hay duda, pues, de que cuando se manifiesten cambios significativos en el proyecto propuesto, tales como la exten-sión del proyecto o su localización, hay que someterlo a una nueva evaluación. 3 Yorkley, Zoning Law and Practice 4th, Sec. 20-3, pág. 20-14 (2007). Véase, también, T-JAC, Inc. v. Caguas Centrum Limited, supra. (7)
En Puerto Rico, le corresponde a la JP llevar a cabo esa evaluación y determinar si lo que procede es una enmienda a la consulta original o la presentación de una nueva consulta. A esos fines, el Reglamento Adjudicativo de la JP, supra, dispone:
De surgir la necesidad de hacer cambios a un proyecto que alteren la consulta aprobada vigente, se deberá someter una solicitud de enmienda a la Junta explicando en detalle la na-turaleza de la enmienda y la razón para la misma, así como toda documentación (nuevos planos, estudios, etc.) pertinente y necesaria para que la Junta pueda tomar la determinación correspondiente. ... Como resultado de la evaluación de los cambios propuestos y dependiendo de la naturaleza y magni-tud de los mismos con relación a la consulta original, la Junta podrá requerir la radicación de una nueva consulta y el cobro correspondiente. Sección 7.02 del Reglamento Adjudicativo, 23 R.RR. see. 560.235.
El desarrollo preliminar es un trámite que se da ante ARPe después de aprobada la consulta de ubicación por la JP, mediante el cual “se obtiene la aprobación de la representación gráfica ... de la forma en que quedarán ur- *952 banizados los terrenos”. (Énfasis suplido.) Diccionario Técnico de los Reglamentos de la JP, Reglamento Núm. 7360, 11 de diciembre de 2008, pág. 46. Según la naturaleza del proyecto, la representación debe mostrar la ubicación y or-ganización del desarrollo, incluyendo todo uso propuesto, íd. Asimismo, el término uso se define como “el propósito para el cual la estructura o edificio fue diseñado, es usado o se pretende, usar”. Diccionario Técnico de los Reglamentos de la JP, supra, pág. 127.
Los permisos que otorga ARPe, tales como el de desarrollo preliminar y el permiso de urbanización, son fases en un proceso posterior a la probación de la consulta de ubicación que permite a la agencia concretar los detalles del desarrollo, supervisar la utilización de ciertos materiales y autorizar el movimiento de terreno, entre otros asuntos.(8) Precisamente, esta es la etapa que tanto la JP como ARPe definen como la “fase operacional”.(9)
La importancia social de la ordenación territorial se reconoció en Estados Unidos a principios del siglo XX como un medio para controlar el desparrame urbano y las condiciones insalubres de las comunidades en las áreas urbanas densamente pobladas. Así, la zonificación sirvió de herramienta para limitar el uso de la tierra con el objetivo de lograr un uso más eficiente y para implementar una planificación sistemática e integrada que asegure la seguridad, la salubridad, el desarrollo y el bienestar general del país y de la comunidad. 1 Anderson’s American Law of Zoning 4th Sec. 1.14, pág. 21 (1996). La forma como se *953 logra una planificación que asegure estos valores para la sociedad es mediante el estudio de varios factores poblacio-nales, como son las necesidades actuales y futuras de la comunidad y del país, el crecimiento poblacional proyec-tado, los índices económicos, la existencia y el estado de los sistemas de sanidad y transportación y de instalaciones recreativas, el uso actual del suelo, entre otros. Anderson’s, supra, Sec. 1.03, pág. 7. El poder de zonificar complementa el poder de planificar, ya que a través de la zonificación, el Estado regula el uso de la propiedad y pone en práctica la política pública y los principios de lá planificación que guiarán del desarrollo armonioso del país.
En fin, la planificación es un ejercicio integrador que busca salvaguardar el bienestar social y económico del país. Así se plasma en las leyes habilitadoras de la JP y de ARPe. Es por eso que hemos resuelto que una declaración de impacto ambiental, como instrumento de planificación, tiene que integrar todas las etapas o fases del desarrollo de. un proyecto. Colón Cortés v. Pesquera, 150 D.P.R. 724, 779-780 (2000). Este enfoque responde a que una agencia no podrá tomar las decisiones que le incumben, ejercer sus facultades y aplicar su pericia eficientemente si no se le presenta el proyecto en su totalidad y de forma integrada. Por eso, aunque la consideración de un proyecto por las agencias de planificación se den en distintas etapas y cada una de ellas resulte en la expedición de determinado permiso hasta obtener, finalmente, la autorización para un uso particular, no se trata de procesos separados y distintos, sino que son partes integrales de la autorización de: un mismo proyecto. La misión y el deber ministerial de la agencia —a la que se le haya encomendado alguna o algunas etapas , en la consideración de un proyecto— es siempre evaluar la viabilidad del desarrollo particular en su totalidad. Por tal razón, ni el promovente ni la agencia podrá fraccionar un proyecto presentado a ésta para su consideración.
*954 Antes de examinar en detalles la controversia que nos ocupa, debemos recordar que las decisiones de las agencias administrativas merecen la deferencia de los tribunales. Rebollo v. Yiyi Motors, 161 D.P.R. 69, 77 (2004); P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269 (2000). Sin embargo, los tribunales pueden revocar la determinación de una agencia y sustituir su criterio, si la agencia ha actuado de forma ilegal, arbitraria o caprichosa de manera que su decisión constituya un abuso de discreción. Torres v. Junta Ingenieros, 161 D.P.R. 696, 707 (2004); Rebollo v. Yiyi Motors, supra. Por otro lado, la See. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. see. 2175, claramente dispone que las conclusiones de derecho de una agencia son revisables en su totalidad.
1 — I 1 — l
El Tribunal de Apelaciones determinó que ARPe no se extralimitó de sus facultades cuando aprobó el desarrollo alterno del proyecto, porque no otorgó el permiso para aquella parte del proyecto que excedía los sesenta mil pies cuadrados autorizados por la JP en la consulta de ubicación. Concluimos que erró el foro apelativo, pues con su actuación ARPe, en realidad, evaluó y tomó decisiones sobre la construcción de un proyecto distinto al que fue aprobado por la JP, actuación que pretendió subsanar alu-diendo a un proceso de "enmienda de autorización” por la JP que era improcedente.
El proyecto original, sometido ante la JP en 1987, vis-lumbraba un centro comercial de sesenta mil pies cuadra-dos con unos lotes reservados para ciertos tipos de tiendas, el cual la JP aprobó, considerando la realidad socio-econó-mica del área donde se ubicaría. Este proyecto proponía la relocalización de un supermercado existente (Rosas) en un espacio de veinte mil pies cuadrados. Cuando se presentó *955 el proyecto ante la consideración de ARPe, el promovente ya había alterado la configuración del proyecto en el desa-rrollo preliminar al abandonar la relocalización del super-mercado existente para proponer la ubicación de un super-mercado nuevo (Supermercado Amigo). Con el desarrollo preliminar alterno, otra vez se pretendió modificar el pro-yecto para reubicar los espacios comerciales y reconceptua-lizarlo como parte de un centro comercial mucho más ex-tenso, añadiéndose unos 34,950 pies cuadrados al área total a desarrollar. Evidentemente, ya para el 2000, los planos presentados ante ARPe en la solicitud del desarrollo preliminar alterno se referían a un proyecto completamente distinto al que fue considerado y aprobado por la JP. Estos cambios al proyecto original no solamente alteraron la na-turaleza del proyecto final, sino que, además, pueden ha-ber alterado las consideraciones de viabilidad en las que se fundó la determinación de la JP al aprobarlo.
El que ARPe haya aprobado solamente la fracción del proyecto que cumplía con los límites aprobados en la con-sulta de ubicación, no subsana su actuación ultra vires. La realidad es que la JP nunca estudió el proyecto sometido a ARPe. Por eso no tuvo la oportunidad de evaluar su viabi-lidad e impacto. Recordemos que cuando la JP aprobó la consulta de ubicación, tomó en cuenta información sobre un proyecto comercial específico, motivado por unos facto-res socio-económicos determinados y las necesidades parti-culares de la población que hacían viable el desarrollo para el lugar donde se ubicaría. Asimismo consideró los comen-tarios y endosos de agencias y entidades, como el Departa-mento de Comercio, que se fundamentaban en un análisis del proyecto según presentado originalmente. Al aprobar una fracción de otro proyecto como si se tratara del que fue originalmente adoptado por la JP y continuar emitiendo sobre la marcha permisos para un proyecto a todas luces distinto, ARPe actuó contra la razón de ser de su creación y de los poderes que le fueron delegados en la restructura-ción de la JP en 1975.
*956 La JP es el organismo director del desarrollo ordenado de nuestro país y solamente a ésta le incumben las determinaciones de política pública, de tal modo que no son delegables. ARPe no puede arrogarse estas funciones, aunque entienda que su intervención acelera los procesos de aprobación de los permisos, considerando que ARPe se creó para que la JP pueda dedicar sus esfuerzos a las determinaciones de política pública y las estrategias de desarrollo físico, económico y social del país. En ñn, a ARPe solamente le incumben los asuntos operacionales, con el propósito directivo de velar por el cumplimiento de las leyes y los reglamentos aprobados por la JP. Asoc. Vec. Urb. Huyke v. Bco. Santander, supra; The Richards Group v. Junta de Planificación, supra.
Reiteramos la norma de Colón Cortés v. Pesquera, supra, según la cual los proyectos no pueden fraccionarse para lograr la aprobación de permisos, porque esta actuación priva a las agencias concernidas de evaluar correctamente los factores necesarios y las consecuencias de los proyectos ante su consideración. En este caso, la aprobación parcial por ARPe del proyecto mediante el desarrollo preliminar alterno tuvo el efecto de fraccionar el proyecto ante su consideración en detrimento de la facultad de la JP de ordenar integradamente la planificación de este país.
Además, las alteraciones al proyecto presentadas ante ARPe resultaron en cambios significativos que podrían ha-ber variado la determinación original de la JP de aprobar la consulta de ubicación. Por eso, la JP debe evaluar el proyecto para determinar la procedencia de una nueva con-sulta de ubicación o una enmienda a la original, según su deber de ordenar la planificación integrada tomando en cuenta la totalidad de proyecto propuesto. Por último, el cumplimiento de los acuerdos que recoge la JP en la con-sulta de ubicación es un requisito para la validez de los permisos posteriores. De suma importancia son también las condiciones establecidas en la consulta.
*957 Por todo lo antes dicho, procede revocar la sentencia del Tribunal de Apelaciones y devolver el caso a la JP para que evalúe el proyecto conforme a las normas aplicables. Aten-didas las circunstancias particulares de este caso, mante-nemos la vigencia de los permisos otorgados por ARPe hasta tanto la JP evalúe el proyecto.

Se dictará sentencia de conformidad.

El Juez Presidente Señor Hernández Denton emitió una opinión disidente y concurrente. El Juez Asociado Señor Rivera Pérez concurre sin opinión escrita.

 La razón que se dio para no presentar a tiempo el desarrollo preliminar era que no se había podido firmar el préstamo de construcción por problemas con la inscripción de las fincas. La consulta mantuvo su vigencia hasta el 5 de junio de 1990, ya que se notificó el 5 de diciembre de 1989.

 Véanse: Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 79 (2000); Junta de Planificación v. J.A.C.L., 109 D.P.R. 210, 214 (1979).

 La Exposición de Motivos de la Ley Orgánica de la Administración de Regla-mentos y Permisos (Ley Orgánica de ARPe) reconoce el cúmulo de las funciones operacionales que *947 recaen sobre la JP, que impide que la agencia pueda desempeñar su función primaria de orientar y coordinar el desarrollo integral de Puerto Rico. Así, dispone:
“A tenor con lo anterior y para fortalecer el proceso de planificación integral, haciendo a su vez más eficiente su instrumentación, se crea una Administración de Reglamentos y Permisos cuya función básica será ejecutar las funciones operaciona-les que al presente desempeña la Junta y aplicar y velar por el cumplimiento de las leyes y reglamentos de planificación, permitiendo a la Junta de Planificación que dedique todos sus esfuerzos y recursos a su función esencial de integrar y coordinar la formulación e implementación de las políticas y estrategias del desarrollo físico, económico y social de Puerto Rico.” Ley Núm. 76 de 24 de junio de 1975 (1975 (Parte 1) Leyes de Puerto Rico 234).

 Además, el Art. 16 de la Ley Orgánica de ARPe establece, en lo pertinente, que “[no] se expedirá ningún permiso de construcción, o de uso, para ningún edificio o estructura ... que esté en conflicto con las recomendaciones de la Junta de Plani-ficación de Puerto Rico pertinentes al plan de Desarrollo Integral de Puerto Rico, el Programa de Inversiones de Cuatro Años y los Planes de Uso de Terrenos”. 23 L.P.R.A. sec. 71o.

 En Puerto Rico, hemos reconocido expresamente la naturaleza cuasijudicial de los procesos de aprobación de las variaciones en uso y las consultas de ubicación. López v. Junta Planificación, 80 D.P.R. 646 (1958). La Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico define el término re-glamento como “cualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley”. Sec. 1.3 de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2102(0. Así, en Luán Investment Corp. v. Román, 125 D.P.R. 533, 545-546 (1990), establecimos que el proceso de plánificar y zonificar es un proceso cuasilegislativo y reglamentario. La “adjudicación”, por otro lado, se define como “el pronunciamiento mediante el cual la agencia determina derechos, obligaciones o privilegios que co-rrespondan a una parte”. 3 L.P.R.A. sec. 2102(b). Cuando la JP determina aprobar una consulta de ubicación o una variación en uso, la agencia está ejerciendo sus facultades para determinar la política pública y guiar el desarrollo ordenado del país, *949 pero, además, está adjudicando los derechos de las partes. Por eso, la agencia, al aprobar una consulta de ubicación o una variación en uso, está reglamentando a través de un proceso cuasijudicial y adjudicativo. La mayoría de jurisdicciones en Estados Unidos reconocen la naturaleza cuasijudicial de este tipo de determinación de las agencias de planificación. 3 Yorkley, Zoning Law and Practice 4th Sec. 20-16, pág. 20-69, y Sec. 21-1, pág. 21-7 (2007).

 En ARPe, por ejemplo, la consulta de ubicación es indispensable para que la agencia pueda autorizar la construcción del proyecto y abundar sobre los pormenores del desarrollo propuesto, a base de las facultades encomendadas por ley en su pericia. Por eso, las disposiciones de la Consulta de Ubicación que aprueba la Junta de Planificación (JP) establecen los parámetros que ARPe debe seguir al considerar los permisos siguientes. En este caso, la resolución de la JP en 1988 dispuso: “Se utilizarán los parámetros de diseños conforme a un Distrito de Zonificación C-4.” Apéndice de la Petición de certiorari, pág. 194.

 Yorkley esboza este criterio al referirse a las variaciones en la ordenación territorial. Sin embargo, es igualmente aplicable a la consulta de ubicación. La con-sulta de ubicación se diferencia de una variación en el uso, porque el mismo regla-mento de planificación hace una determinación previa sobre las situaciones en las que se podrá dispensar de aplicar la zonificación para aplicar otra en particular. La variación se prevé como un mecanismo para salvaguardar la constitucionalidad de los reglamentos de planificación y zonificación, creando una forma de exceptuar la aplicación del reglamento, adjudicándolo caso a caso cuando se justifique. Véase T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 117 (1998).

 Véase el Reglamento para la Certificación de Proyectos de Construcción, Reglamento Núm. 12 de Planificación de ARPe, según enmendado el 8 de mayo de 1984, aplicable al caso de autos. El primer Reglamento Adjudicativo de la JP se aprobó en 1989 y, por lo tanto, no aplicaba en este caso.

 La fase operational es aquella parte de la función de revisión de proyectos que comprende, entre otros, aplicar y velar por el cumplimiento de las leyes y los reglamentos promulgados para el uso, el desarrollo y la subdivisión de los terrenos, así como para la construcción de edificios y estructuras. Art. 3 de la Ley Orgánica de la JP, 23 L.P.R.A. sec. 62b(f), y Art. 3 de la Ley Orgánica de ARPe, 23 L.P.R.A. see. 71b(Z).